**ASHLAND OIL, INC., Plaintiff,**

v.

**FEDERAL TRADE COMMISSION, et al., Defendants,**

and

**John E. Moss, Chairman, Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, United States House of Representatives, Intervenor.**

Civ. No. 75–1956.

United States District Court, District of Columbia.

Feb. 2, 1976.

Williams, Connolly & Califano, Washington, D. C., for intervenor-defendant John E. Moss.

## MEMORANDUM AND ORDER

CORCORAN, District Judge.

### I. BACKGROUND

#### A. *The Action and Parties*

This civil action for declaratory and injunctive relief was commenced pursuant to Chapter 7 of the Administrative Procedure Act (5 U.S.C. § 701 *et seq.*) and 28 U.S.C. §§ 1331–32, 1337, 1361, 1651, and 2201–02. The amount in controversy, exclusive of interest and costs, is in excess of $10,000. Venue properly lies in this district by virtue of 28 U.S.C. § 1391(e)(1).

The plaintiff, Ashland Oil, Inc. ("Ashland"), is incorporated under the laws of the State of Kentucky, with principal offices in Ashland, Kentucky. Plaintiff's business encompasses various aspects of the petroleum industry, including the exploration and development of oil and gas properties.

Defendant Federal Trade Commission ("FTC") is a federal regulatory agency established under, operating pursuant to, and administering the Federal Trade Commission Act ("FTC Act") (15 U.S.C. § 41 *et seq.*). Paul Rand Dixon, Acting Chairman of the FTC,[1] and Charles A. Tobin, Secretary, as well as FTC Commissioners M. Elizabeth Hanford and Stephen A. Nye, have been named as defendants in their official capacities.

John E. Moss is a member of the United States House of Representatives and Chairman of the Subcommittee on Oversight and Investigations of the House Interstate and Foreign Commerce Committee ("Subcommittee"). Congressman Moss has intervened of right in this action as party-defendant by virtue of Fed. R.Civ.P. 24(a) and House Resolution 899 (94th Cong., 1st Sess.).

Ray S. Bolze and Roger C. Simmons, Howrey & Simon, Washington, D. C., for plaintiff.

Jeffrey Axelrad, Dept. of Justice, and William A. E. Doying, F. T. C., Washington, D. C., for defendants FTC, and others.

Joseph A. Califano, Jr., Benjamin W. Heineman, Jr. and Richard M. Cooper,

---

1. At the time of commencement of this action, Louis A. Engman was Chairman of the FTC and was named as a party-defendant. Upon Mr. Engman's subsequent resignation, Paul Rand Dixon became acting Chairman and has been substituted as party-defendant pursuant to Fed.R.Civ.P. 25(d)(1).

### B. Chronological Development of the Case

On or about April 15, 1975, the FTC served upon the plaintiff a "Natural Gas Survey Special Report" order ("Special Report") issued pursuant to Section 6(b) of the FTC Act (15 U.S.C. § 46(b)). By this order, Ashland was required to file a "Special Report" and was advised that non-compliance would result in the imposition of penalties under applicable provisions of federal law. On August 27, 1975, Ashland responded by filing with the Commission a completed Special Report containing the information sought by the FTC. Included in the information submitted was highly sensitive competitive data detailing the company's reserve estimates for all of its natural gas leases and contracts nationwide.[2] Ashland's submission was accompanied by a letter from J. Creig Coogan, Vice President of Ashland Exploration Company (a division of Ashland Oil, Inc.) stating that the company's information on gas reserves was confidential and of a proprietary nature, such that disclosure would result in competitive injury and that such information was submitted to the Commission with the specific reservation that plaintiff could claim its right to have the materials therein provided "accorded confidential treatment and be protected from disclosure." (Plaintiff's Complaint, Exhibit AA).

On October 6, 1975, Congressman John E. Moss, in his capacity as a member of Congress, requested the FTC to make available to him data gathered by the Commission pertaining to lease extensions on federal lands. (*Id.*, Exhibit A). By letter dated October 24, 1975, Charles A. Tobin, Secretary of the Commission, denied the Congressman's request for the reason that the data sought constituted "trade secrets and commercial or financial information [and] geological and geophysical information and data, including maps, concerning wells" which were exempt from mandatory disclosure under the Freedom of Information Act (5 U.S.C. § 552(b)(4) and (b)(9)). Consequently, Secretary Tobin concluded that the Commission was without discretion to release such exempt records. (*Id.*, Exhibit B).

On October 29, 1975, Congressman Moss sent a second request to the FTC, but this time in his official capacity as Chairman of the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce. (*Id.*, Exhibit C). Congressman Moss's letter noted that the Freedom of Information Act was not authority to withhold information from Congress,[3] and that this second request was made not in the Congressman's individual capacity, but "as Chairman of the Subcommittee on Oversight and Investigations" for the purpose of fulfilling the Subcommittee's general oversight responsibilities.

The FTC treated Congressman Moss's second letter as a formal Congressional request and, by letter of November 18, 1975, advised the Congressman that the natural gas reserve data which he requested would be furnished on November 28, 1975. In this reply, Chairman Engman cautioned that several of the companies involved considered the data "competitively very sensitive and might constitute trade secrets which the Commission is prohibited from making public under Section 6(f) of the Federal Trade Commission Act," and that the U. S. Geological Survey also was "of the opinion that this is confidential, proprietary information." He went on to mention that the Commission continued to be involved in litigation with companies refusing to provide such data under the

---

**2.** The information contained in Ashland's Special Report included the locations and identities of plaintiff's natural gas leases, together with information revealing the percent ownership of various individuals in such leases and Ashland's internal estimates as to gas reserves in those leases. (*See* Affidavit of George C. Hardin, Jr., Plaintiff's Memorandum in Support of Motion for Preliminary Injunction).

**3.** *Cf.* 5 U.S.C. § 552(c).

Special Report order. Therefore, Chairman Engman emphasized that:

As a result, your Subcommittee will receive data only from those companies which have voluntarily complied with the Commission's orders. This fact is not lost upon companies faced with information requests from the Commission and will do little to encourage voluntary compliance, especially if any sensitive information is made public.

Therefore, the Commission respectfully but strongly urges your Subcommittee to maintain the confidentiality of the information submitted in response to your request and in particular, the reserve estimates furnished in response to Question 5 of the Natural Gas Energy Study Order. (*Id.*, Exhibit D).

Ashland was advised of the Commission's decision on November 18, 1975. On November 21, 1975, plaintiff received written notice of the Commission's intention to disclose its reserve data to Congressman Moss's Subcommittee. (*Id.*, Exhibit E). On the same day, Ashland was informed by telephone that the Commission intended to turn over the data to Congressman Moss on demand and would not be bound to the November 28th date mentioned in Chairman Engman's letter.

This action was filed on November 24, 1975, and on that date, plaintiff moved for and was granted a temporary restraining order enjoining the Federal Trade Commission from releasing the information in issue, thereby preserving the *status quo* until the Court considered the merits of Ashland's claims.[4]

On December 2, 1975, the Subcommittee authorized and the Chairman of the Interstate and Foreign Commerce Committee signed a subpoena *duces tecum* requiring FTC Chairman Engman to appear before the Subcommittee on December 3, 1975, and to bring with him any and all records within the Federal Trade Commission's control or custody or within the Federal Trade Commission's means to produce appertaining to or involving oil and/or gas lease extensions on Federal lands, including Ashland Oil, Inc. and including all correspondence between the Federal Trade Commission and Ashland Oil, Inc. relating in any manner to agreements or proposed agreements to hold such records confidential or to give advance notice of the release thereof. (*See* H.R.Rep.No.94–756, 94th Cong., 1st Sess., at 3–4 (1975)).

By letter of December 3, 1975, Chairman Moss informed Mr. Engman that the Subcommittee planned "no enforcement action of this subpoena until after the Court has considered" the questions arising in this case. (*Id.*, at 5).

On December 18, 1975, the House of Representatives assented to House Resolution No. 899. (121 Cong.Rec. 12, 918–919 (daily ed. December 18, 1975)). Section 1 of the Resolution provides:

*Resolved*, That the chairman of the Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce is authorized to intervene and appear in the pending action entitled "Ashland Oil Incorporated, plaintiff against Federal Trade Commission, et al., defendant," Civil Action 75–1956, United States District Court for the District of Columbia on behalf of the Committee on Interstate and Foreign Commerce *in order to secure information relating to natural gas reserves now in the possession of the Federal Trade Commission for the use of the committee and the House.* (Emphasis supplied.)

On January 16, 1976, after a hearing held in open court, we granted Congressman Moss's motion to intervene pursuant to Fed.R.Civ.P. 24(a).

Plaintiff has moved for preliminary and permanent injunction. Defendants Moss and FTC have filed motions for

---

4. By stipulation among the parties, the Temporary Restraining Order remained in effect until February 3, 1976.

summary judgment or, alternatively, to dismiss. The Court, *sua sponte*, advanced and consolidated the hearing on the merits of Ashland's complaint with that on its motion for preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2).

### C. *Section 6(f) of the Federal Trade Commission Act*

The principal arguments on the merits of this case focus on Section 6(f) of the FTC Act, 15 U.S.C. § 46(f), which empowers the Commission

> *To make public* from time to time such portions of the information obtained by it hereunder, *except trade secrets and names of customers*, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith the recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use. (Emphasis supplied.)

Ashland maintains that the language employed is unequivocal in prohibiting disclosure of trade secrets by the FTC to any third party, including the Congress; that this construction is buttressed by the legislative history of the Act, by the wording and judicial interpretation of similar statutory provisions, and finally by the "historical position" of the Attorney's General's Office from 1909 to the present that such language ordinarily indicates an absolute prohibition against executive disclosures of proprietary data to the legislative branch, absent adequate assurances that confidentiality will be maintained.

In addition to specifically invoking confidentiality protection in submission of its reserve estimates to the FTC, Ashland states that it relied upon the belief that the Commission would abide by the mandate of Section 6(f), as well as the FTC's own rules, and refrain from divulging the materials in issue to Congress. Even if the FTC's disclosure to Congress is held pursuant to a lawful subpoena, plaintiff believes that the ultimate result will be a serious infringement of its common law and statutory rights, and a violation of its constitutional guarantees of equal protection, due process and freedom to petition the government.

Congressman Moss and the FTC respond that Section 6(f) clearly does not restrict Congressional access to trade secrets or other types of information collected by the FTC, since such a limitation upon the inherent investigatory power of Congress may not be imposed by implication. The pertinent language of the Section—"to make public"—does not explicitly refer to Congress, and, thus, according to defendants' argument, cannot be read as an inhibition of Congress' statutory right to "annual and special reports" or its Article I subpoena power. Also relying on legislative history, defendants Moss and FTC conclude that the Commission was intended to be no more than an extension of the Congressional "visitorial power," at least in its information gathering function, and, therefore, a convenient storehouse of information readily accessible to the Congress.

In addition, defendants contend that the Subcommittee's subpoena and the underlying investigation of the natural gas industry are legitimate exercises of the powers conferred upon the Congress under Article I; and that once such constitutional powers have been legitimately invoked by a coordinate branch, the courts are bound to accord great deference and refrain from unwarranted interferences with on-going Congressional investigations. Defendants attempt to dispose of Ashland's remaining arguments in short order, contending that once a legitimate legislative purpose has been established, "Ashland's constitutional, statutory, and equitable arguments must fall before the legitimate assertion of the constitutional power of the Congress." (Intervenor's Memorandum in Support of Motion to Dismiss, p. 14).

## II. ASHLAND'S NATURAL GAS RESERVE ESTIMATES

Since plaintiff endeavors to invoke common law and statutory protection for its reserve estimates, the Court must make a threshold determination whether such materials fall within the "widely relied-upon definition of a trade secret found at 4 *Restatement of Torts* § 757, comment b (1939),"[5] *viz.*:

> A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which give him an opportunity to obtain an advantage over competitors, who do not know or use it. . . . 4 *Restatement of Torts* § 757, p. 5 (1939).

According to the *Restatement*, a more precise definition of what constitutes a trade secret is not possible. However, Comment b does enumerate a number of factors which may assist a court in determining whether particular data rises to the level of a trade secret:

> (1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; (6) the ease or difficulty with which the information could be properly acquired or duplicated by others. 4 Restatement of Torts § 757, Comment b, p. 6 (1939).[6]

On the record before the Court, it is evident that Ashland's natural gas reserve estimates satisfy each of these criteria. The data in issue has been compiled at the considerable expense of "hundreds of thousands of man-hours and millions of dollars" and enables plaintiff to successfully bid on federal natural gas leases, in competition with "dozens of other companies." Consequently, such information is "highly valued and closely guarded," not only by Ashland, but throughout the natural gas industry. (*See* Affidavit of George C. Hardin, Jr., Plaintiff's Memorandum in Support of Motion for Preliminary Injunction).

Moreover, the agency with particular expertise in the regulation of natural gas, the Federal Power Commission ("FPC"), has explicitly recognized natural gas reserve estimates to be valuable, proprietary assets. For example, in *Amerada Hess Corporation*, 50 F.P.C. 1049, 1050 (1973), the agency observed:

> To begin with, it must be recognized that a natural gas company's reserve data, much like a patent or trade secret, constitutes a valuable and closely guarded asset. Making this asset available to competitors, without due compensation, would most certainly be inimical to competition, especially in highly competitive areas, as the comments of Ashland Oil, Inc. illustrate:
>
> * * * Ashland Oil, Inc. has obtained leases in Federal off-shore areas by payments to the United States Government of large bonuses. Unleased acreage adjoins and offsets certain of these leases. If significant reserves are discovered and if the reserves extend into unleased areas, Ashland would not disclose the results of such exploration until an opportunity is available to bid in a drainage sale of the offsetting acreage. The information developed on such leases is highly confidential and proprietary in nature and disclosure of such information prior to the drainage sale would destroy Ashland's competitive advantage in bidding at such sale by making available to other companies the results of Ashland's exploration efforts made at great expense of it.

---

**5.** *See Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 474–75, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974).

**6.** This statement of the applicable test has received judicial approval. *See, e. g., Speedry Chemical Products, Inc. v. Carter's Ink Co.*, 306 F.2d 328, 331 (2d Cir. 1962).

Similarly determining such reserve data to constitute "valuable property" in *Reliability of Electric and Gas Service*, 49 F.P.C. 1428, 1429 (1973), the FPC discussed the underpinnings of its holding as follows:

> The policy reasons underlying our assurance of confidentiality are obvious. In a period when the gas supply shortage is most acute, disclosure of detailed reserve data would undoubtedly inhibit future exploration for new gas reserves since speculators and competitors could equally benefit from the geological and geophysical expenditures of other companies. A competitor would particularly benefit from knowledge of another producer's uncommitted reserves for particular locations, especially in highly competitive areas. In addition, it would be extremely unfair to sellers of gas to disclose such data to potential buyers with whom they negotiate for the sale of gas. *Furthermore, we believe that certain reserve data constitutes a valuable property right which should not be taken without due process and just compensation.* (Emphasis added).

The federal courts have also acknowledged that detailed competitive information of the type here in issue constitutes trade secrets entitled to protection from public disclosure.

In *Abbott v. United States*, 239 F.2d 310, 314 (5th Cir. 1956), the Court found the geophysical surveys underlying a company's reserve estimates to be of "almost inestimable practical value in the essential program of continuous exploration and development of mineral resources which is the life blood of an oil producing company." Moreover, once disclosed, such data possesses "a 'negative' value" in the hands of a competitor who can use it to "undertake development, procure leases, and impede or thwart the company's plans." *Accord Hunter v. Shell Oil Co.*, 198 F.2d 485 (5th Cir. 1952); *Ohio Oil Co. v. Sharp*, 135 F.2d 303 (10th Cir. 1943); *Pratt v. Shell Petroleum Corp.*, 100 F.2d 833 (10th Cir.

1938). *See also John T. Lloyd Laboratories, Inc. v. Lloyd Brothers Pharmacists, Inc.*, 131 F.2d 703, 707 (6th Cir. 1942); *Dollac Corp. v. Margon Corp.*, 164 F.Supp. 41, 59 (D.N.J.1958), *aff'd*, 275 F.2d 202 (3d Cir. 1960); *Jerrold-Stephens Co. v. Gustaveson, Inc.*, 138 F.Supp. 11, 15–16 (W.D.Mo.1956); *Newell v. O. A. Newton & Son*, 104 F.Supp. 162, 165 (D.Del.1952). And in *Continental Oil Co. v. FPC*, 519 F.2d 31, 32, 35 (5th Cir. 1975), the Fifth Circuit voided an FPC order permitting public access to materials submitted by interstate natural gas companies which contained "detailed intrastate sales information, including the names of purchasers, date and location of the sale, pressure base, annual sales volume and price terms," and data with reference to "extent of supply." The Court held that such information fell squarely within the Freedom of Information Act's "trade secret" exemption from public disclosure, reasoning that disclosure "would alter industry custom and existing relationships to the disadvantage of petitioner's competitive positions." 519 F.2d at 35.

■ After careful evaluation of the Hardin Affidavit, *supra*, with due deference to the findings of the National Geological Survey, and in consideration of the cases discussed *supra*, the Court is of the opinion that at least that portion of the data in issue detailing Ashland's natural gas reserve estimates constitutes "trade secret" information within the purview of Section 6(f) of the FTC Act.

### III. THE SUBCOMMITTEE SUBPOENA

■ While the investigatory power of Congress is not explicitly mentioned in the Constitution, the courts have long held the power to be necessarily implied in the legislative function under Article I, as well as other portions of the Constitution.[7] *McGrain v. Daugherty*, 273 U.S. 135, 161, 47 S.Ct. 319, 71 L.Ed. 580 (1927); *see also Anderson v. Dunn*, 6 Wheat. (19 U.S.) 204, 5 L.Ed. 242 (1821); *United States v. Rumely*, 345 U.S. 41, 46,

---

7. "In actual legislative practice, power to secure needed information . . . has long been treated as an attribute of the power to legislate. It was so regarded in the British

73 S.Ct. 543, 97 L.Ed. 770 (1953). Absent such a power, a legislative body could not "wisely or effectively" evaluate those conditions "which the legislation is intended to affect or change." *McGrain v. Daugherty, supra,* 273 U.S., at 175, 47 S.Ct. at 329.

■ Although the investigatory power is "penetrating and farreaching" in scope, *Barenblatt v. United States,* 360 U.S. 109, 111, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959), it is not unlimited. "Its boundaries are defined by its source." *Watkins v. United States,* 354 U.S. 178, 197, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, at 504, n. 15, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975). Hence, the parameters of the inquiry may be no broader than the "legitimate sphere of legislative activity." *See Eastland v. United States Servicemen's Fund, supra,* 421 U.S., at 504, 95 S.Ct. 1813; *Kilbourn v. Thompson,* 103 U.S. 168, 189, 26 L.Ed. 377 (1881); *McGrain v. Daugherty, supra,* 273 U.S., at 174, 47 S.Ct. 319.

■ The standard to be applied in determining whether the Congressional investigatory power has been properly asserted in a particular case was articulated by the Supreme Court in *Wilkinson v. United States,* 365 U.S. 399, 408–09, 81 S.Ct. 567, 5 L.Ed.2d 633 (1961): (1) the Committee's investigation of the broad subject matter area must be authorized by Congress; (2) the investigation must be pursuant to "a valid legislative purpose";[8] and (3) the specific inquiries involved must be pertinent to the broad subject matter areas which have been authorized by the Congress.

■ In evaluating these requirements, the Court must consider the relevant rules of the House, the authorizing resolution, the full committee's resolution by which the Subcommittee was authorized to proceed, and the nature and context of the legislative proceedings. *Watkins v. United States, supra,* 354 U.S., at 209–15, 77 S.Ct. 1173; *Barenblatt v. United States, supra,* 360 U.S., at 117, 79 S.Ct. 1081; *see also, United States v. Rumely, supra,* 345 U.S., at 51, 73 S.Ct. 543; *Sacher v. United States,* 356 U.S. 576, 78 S.Ct. 842, 2 L.Ed.2d 987 (1958). And, in deciding the pertinency, the specific inquiries need only be reasonably related to the major subject matter area under investigation. *Sinclair v. United States,* 279 U.S. 263, 299, 49 S.Ct. 268, 73 L.Ed. 692 (1923).

Applying the foregoing legal principles to the facts of the present case, we note first, that the broad subject matter areas which the Subcommittee is investigating—national energy policy, natural gas supply and production, the need for emergency natural gas legislation and the role of federal agencies in national energy affairs—are areas committed to the Subcommittee's jurisdiction by proper Congressional authorization.

Rule X of the Rules of the House of Representatives (94th Cong.) gives the House Committee on Interstate and Foreign Commerce jurisdiction over, *inter alia,* "interstate and foreign commerce generally," "interstate oil compacts and petroleum and natural gas except on public lands," and "consumer affairs and consumer protection." House Rule X,

---

Parliament and in the colonial Legislatures before the American Revolution, and a like view has prevailed and been carried into effect in both houses of Congress and in most state Legislatures." *McGrain v. Daugherty,* 273 U.S. 135, 161, 47 S.Ct. 319, 324, 71 L.Ed. 580 (1927).

**8.** The types of legislative activities which have justified exercise of the power to investigate include: the primary functions of legislating and appropriating, *Barenblatt v. United States, supra,* 360 U.S., at 109, 79 S.Ct. 1081; the function of deciding whether or not legislation is appropriate, *Quinn v. United States,* 349 U.S. 155, 161, 75 S.Ct. 668, 99 L.Ed. 964 (1955); oversight of the administration of laws by the executive branch, *McGrain v. Daugherty, supra,* 273 U.S., at 177, 47 S.Ct. 319; *Sinclair v. United States,* 279 U.S. 263, 295, 49 S.Ct. 268, 73 L.Ed. 692 (1929); and the essential Congressional function of informing itself in matters of national concern, *United States v. Rumely, supra,* 345 U.S., at 43, 45, 73 S.Ct. 543; *Watkins v. United States, supra,* 354 U.S., at 200, n. 3, 77 S.Ct. 1173.

§ 1(L)(1), (3) and (8). The committee has extensive oversight responsibilities including the duty to review and study on a continuing basis the "application, administration, execution, and effectiveness" of existing legislation and "any conditions or circumstances which may indicate the necessity or desirability of enacting new or additional legislation" within the jurisdiction of the committee. House Rule X, § 2(b); see also 2 U.S.C. § 190d.

Rule X also confers upon each of the standing committees of the House the power to "establish an oversight subcommittee . . . to conduct oversight in the area of their respective jurisdictions, to assist in carrying out its responsibilities. . . ." House Rule X, § 2(b)(1). Rule X of the House Committee on Interstate and Foreign Commerce (94th Cong.) establishes the Subcommittee on Oversight and Investigations, giving it jurisdiction, *inter alia*, to " . . coordinate its work with the work of the other standing subcommittees . . . " and to "maintain regular communication with the standing subcommittees in order to obtain advice on subjects for investigation."

A resolution agreed to by the full committee on February 26, 1975, establishes the jurisdiction of the Subcommittee as follows:

> Jurisdiction: Responsibility for Oversight of agencies, departments and all programs within the jurisdiction of the full committee and to conduct such investigations within such jurisdiction.

Pursuant to the authority of these Rules and the resolution of February 26, 1975, and in order to carry out its legislative review functions under 2 U.S.C.

§ 190d,[9] the Subcommittee on April 17, 1975, approved an extensive study of national energy policy, specifically including the subject of "natural gas supplies" and "curtailments of natural gas." Under the Rules of the House of Representatives and an enabling resolution of the full committee, the Subcommittee has subpoena power to compel attendance of witnesses and production of documents in furtherance of such an investigation.[10] The subpoena in this case was issued by the Subcommittee to the FTC pursuant to that enabling resolution.

Second, we note that the committee and Subcommittee are clearly engaged in "a valid legislative purpose" with respect to the present study of energy problems, natural gas supply and production, emergency natural gas legislation and the role of the Federal Trade Commission, the Federal Power Commission, and other agencies responsible for national energy policy. The broad subject matters under investigation have direct relation to pending legislation,[11] to the decision whether or not to legislate, to the function of overseeing the administration of laws by federal agencies, and to the function of informing itself generally concerning matters of national importance.[12]

And finally, we find that the Subcommittee's specific inquiries to the FTC in the instant case are pertinent to the broad subject matter areas which the House of Representatives has authorized the committee and Subcommittee to investigate. The supply and production of natural gas on federal lands has a distinct impact on the interstate market and national energy policy. The accuracy of reporting regarding natural gas

---

**9.** Section 190d requires, *inter alia,* that each standing committee of the Congress "shall review and study, on continuing basis, the application, administration, and execution of those laws, or parts of laws, the subject matter of which is within the jurisdiction of that committee."

**10.** The House Committee on Interstate and Foreign Commerce agreed to a resolution on April 17, 1975, which gave the Subcommittee authority to require by subpoena the attend-

ance of witnesses and production of documents. *Cf.* House Rule XI, § 2(m) (94th Cong.)

**11.** *See, e. g.,* H.R. 9464, 94th Cong., 1st Sess.

**12.** *See generally,* Hearings on Natural Gas Supplies Before the Subcommittee on Oversight and Investigations of the House Committee on Interstate and Foreign Commerce, 94th Cong., 1st Sess. (1975) (two volumes).

supplies on federal lands relates to an important question of whether natural gas producers, like Ashland, are properly reporting their reserves.

The specific inquiry directed to the FTC pertains to the need for and content of the proposed Natural Gas Emergency Act of 1975, H.R. 9446, 94th Cong., 1st Sess. (which was reported by the full committee and is currently awaiting action by the full House) and is apposite to an authorized area of investigation regarding the role of the FTC, FPC and other federal agencies with respect to supply and production of natural gas.

Moreover, the legitimacy of the specific inquiry to the FTC here has been ratified by the full House which authorized Chairman Moss to intervene in this action to secure the subpoenaed information "now in the possession of the Federal Trade Commission for the use of the committee and the House" H.Res.No.899, § 1, 121 Cong.Rec. 12, 918–19 (daily ed. December 18, 1975).

 In summary, we find that the particular investigation here in issue is directly related to and in furtherance of "a legitimate task of Congress." *Watkins v. United States, supra,* 354 U.S., at 187, 77 S.Ct. 1173. The Subcommittee, in issuing the subpoena, was acting under the clear mandate of the full committee and the House of Representatives to investigate within the "sphere of legitimate legislative activity" and that grant of authority is itself sufficient to show that the investigation upon which the Subcommittee has embarked "concerned a subject on which 'legislation could be had.'" *Eastland v. United States Servicemen's Fund, supra,* 421 U.S., at 506, 95 S.Ct. at 1823; *McGrain v. Daugherty,* 273 U.S., at 177, 47 S.Ct. 319; *see also Communist Party v. Control Board,* 367 U.S. 1, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961).

## IV. PLAINTIFF'S MOTION FOR PRELIMINARY AND PERMANENT INJUNCTION

The factors to be considered by a court in its determination of whether to grant injunctive relief were articulated by the Court of Appeals for the District of Columbia, per Burger, J., in *Virginia Petroleum Jobbers Association v. Federal Power Commission,* 104 U.S.App.D.C. 106, 259 F.2d 921, 925 (1958). The Court stated:

> Essentially, four factors influence our decision: (1) Has the petitioner made a strong showing that [he] is likely to prevail on the merits? . . . (2) Has the petitioner shown that without such relief, it will be irreparably injured? . . . (3) Would the issuance of a stay substantially harm other parties interested in the proceeding? . . . (4) Where lies the public interest?

Since the Court believes the second element of this test to be dispositive of the present action, we focus our attention on the requirement that the plaintiff demonstrate irreparable injury in the absence of an injunction.

 Injunctive relief is appropriate only "to prevent existing or presently threatened injuries" and "will not be granted against something merely feared as liable to occur at some indefinite time in the future." *Connecticut v. Massachusetts,* 282 U.S. 660, 674, 51 S.Ct. 286, 291, 75 L.Ed. 602 (1930). *See also, General Fireproofing Company v. Wyman,* 444 F.2d 391, 393 (2d Cir. 1971). Injunctions will not be granted where the injuries complained of are prospective and "which may, indeed, never occur." *Crimmins v. American Stock Exchange, Inc.,* 346 F.Supp. 1256, 1262 (S.D.N.Y. 1972). The injury complained of must be of such *imminence* that there is a "clear and present" need for equitable relief to prevent irreparable harm. *Hershey Creamery Co. v. Hershey Chocolate Corp.,* 269 F.Supp. 45 (S.D.N.Y.1967); *see also Assn. of Professional Engineering Personnel v. Radio Corp. of America,* 183 F.Supp. 834 (D.C.N.J.1960). And the required showing of irreparable injury is not eliminated simply by virtue of a claim alleging violation of statutory or constitutional rights (unless the requirement has been specifically eliminated by statute). Thus, in *United Fuel Gas Co.*

*v. Railroad Commission,* 278 U.S. 300, 49 S.Ct. 150, 73 L.Ed. 390 (1928), the Supreme Court noted:

> Suitors may not resort to a court of equity to restrain a threatened act merely because it is illegal or transcends constitutional powers. They must show that the act complained of will inflict upon them some irreparable injury. 278 U.S., at 310, 49 S.Ct., at 152 (Stone, J.)

*See also Newtex S. S. Corp. v. United States,* 107 F.Supp. 388 (S.D.N.Y.1952), *aff'd,* 344 U.S. 901, 73 S.Ct. 285, 97 L.Ed. 696; *Ellis Raw Bar v. District of Columbia Redevelopment Land Agency,* 139 U.S. App.D.C. 385, 433 F.2d 543 (1970).

■ While Ashland couches its concerns in terms of "public disclosure," any irreparable injury to it would result, more precisely, in disclosure to its competitors. Certainly, such injury might logically result as well from general dissemination. But the transfer of such data from the FTC to the Subcommittee and the Subcommittee's review of that information, does not lead inexorably to either public dissemination or disclosure to Ashland's competitors. Moreover, the courts must presume that the commit-

tees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties. *See, Ansara v. Eastland,* 143 U.S.App.D.C. 29, 442 F.2d 751, 754 (1971); *United States v. Tobin,* 195 F.Supp. 588, 613 (D.D.C. 1961).[13]

Ashland argues that this presumption is rebutted by "Congressman Moss's own past practices" and the Subcommittee's handling of trade secrets in the past which, according to plaintiff, "has shown either a total incapacity to protect such trade secrets or a callous indifference to the proprietary nature of those secrets." [14] (Plaintiff's Reply Memorandum, p. 59). In addition, Ashland suggests that the Court take judicial notice of the fact that throughout the pendency of this action, "there has been no promise or commitment that Ashland's trade secret data would be given confidential treatment." *Id.,* at 58. While the Court can appreciate Ashland's concern under these circumstances, it does not appear to the Court that isolated instances of breached confidentiality in the past are sufficient to overcome the continuing presumption of Congressional propriety.

Through its staff counsel, the Subcommittee has indicated that there is "no

13. "This court cannot assume, as plaintiffs urge, that the members of the committee will fail to give consideration to constitutional claims they consider may have merit. On the contrary, we may rightly assume that the legislators are sensitive to, and will endeavor to act conformably to, the principle that the Bill of Rights applies to the legislature's investigations as well as to its enactments." *Ansara v. Eastland,* 143 U.S.App.D.C. 29, 442 F.2d 751, 753–54 (1971).

14. Ashland cites several instances in the past in which it appears that either Chairman Moss or his Subcommittee has failed to accord confidentiality to admittedly sensitive trade materials, *viz.*:

(a) On a prior occasion, involving natural gas reserve estimates submitted to the FTC "subject to an agreement restricting access to and disclosure of the data," Congressman Moss released such proprietary information to the general public. Cf., *Federal Trade Commission v. Texaco, Inc.,* 517 F.2d 137, 141, n. 4, 151, n. 37 (D.C.Cir.1975).

(b) In the Subcommittee's 1975 report on "Natural Gas Supply" hearings, proved re-

serve estimates which had been entered in the logs of Gulf Oil Corporation's estimates for West Delta 27 Field were disclosed in detail at p. 610. Additional natural gas reserve estimates were published at p. 98–102, 177–214, 610, 636–37, 643, 655 and 657. *See* Hearings Before the House Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, "Natural Gas Supplies," 94th Cong., 1st Sess. (1975).

(c) In an arguably analogous situation in which the Chairman sought information detailing the participation of American companies and individuals in the so-called "Arab boycott" of Israel (which materials had been submitted to then Commerce Secretary Rogers C. B. Morton under an executive pledge of confidentiality), Congressman Moss was publicly reported as having stated that a Congressional commitment to respect the confidentiality of such data "would raise serious issues of congressional responsibility" by placing "unconstitutional limits on the authority of Congress." The Washington Post, November 27, 1975, p. D9 (Plaintiff's Exhibit C).

indication" that the Subcommittee "would release information originating from Ashland." (Affidavit of Michael R. Lemov, Intervenor's Motion to Dismiss). And Chairman Moss, through counsel, has represented:

Of course, the Subcommittee does not seek publication of Ashland's trade secrets; it seeks merely production of documents in compliance with a Congressional subpoena. (Response of Chairman Moss to Ashland's Opposition to Motion to Dismiss, p. 6).

Weighing all of these considerations, it appears to the Court, on balance, that the irreparable injury which Ashland seeks this Court to prevent by the issuance of permanent injunctive relief is neither "presently threatened" nor "imminent." The injuries complained of are, rather, "prospective" in nature and "may, indeed, never occur." *See Crimmins v. American Stock Exchange,* supra.

## V. CONCLUSION

If irreparable injury cannot be established, and we hold that it has not been established in this case, injunctive relief is not warranted. It follows that the Court need not consider the other factors outlined in *Virginia Petroleum Jobbers Association,* supra, nor need we reach the merits of Ashland's complaint, nor dispose of the arguments and counter arguments propounded by the parties in support of their respective positions.

The foregoing constitutes the Court's findings of fact and conclusions of law, pursuant to Fed.R.Civ.P. 52(a).

## VI. ORDER

It is, accordingly, by the Court this 2nd day of February, 1976,

Ordered, That plaintiff's motion for preliminary and permanent injunction should be, and the same is hereby, denied. And it is further

Ordered, That defendants' motion to dismiss should be, and the same is hereby, granted. And it is further

Ordered, That the temporary restraining order entered in this action should be, and the same is hereby, dissolved. And it is further

Ordered, That the effect of this order should be, and the same is hereby, stayed until the expiration of ten (10) days from the entry thereof, pursuant to Fed. R.Civ.P. 62(a).