Peter **PECKARSKY**, Plaintiff,

v.

**AMERICAN BROADCASTING COMPANY, INC., et al.,** Defendants.

Civ. A. No. 81–2482.

United States District Court, District of Columbia.

Dec. 6, 1984.

Vincent A. Fuller, Jr., Alexandria, Va., Peter Peckarsky, Washington, D.C., for plaintiff.

Mark D. Herlach, Washington, D.C., Michael J. Calvey, Paul J. Mansfield, Coudert Bros., New York City, for defendants.

## MEMORANDUM

HAROLD H. GREENE, District Judge.

In this action plaintiff, a free-lance journalist and attorney who is appearing *pro se*, has sued defendants American Broadcasting Company (ABC), *et al.*, for their alleged breach of an agreement concerning his 1978 article, "The Selling of the President." The claims asserted against the defendants include common-law breach of contract (Count I), unfair trade practices (Count III), unfair competition (Count IV), fraudulent misrepresentation (Count V), negligent misrepresentation (Count VII), and trade secret conversion (Count VIII) claims, as well as federal copyright (Count II) and civil RICO (Count VI) claims. Plaintiff has moved for summary judgment against various defendants with respect to several of the counts asserted in the complaint;[1] defendants have cross-moved for summary judgment and dismissal of the complaint in its entirety. For the reasons stated below, the Court will deny plaintiff's motion, and it will grant defendants' motion with respect to Counts II, III, IV, VI, and VIII.

### I

Most of the material facts concerning the incidents involved in this case are not in dispute. In July, 1978 plaintiff brought a copy of his copyrighted[2] seventeen page

---

1. Plaintiff seeks summary judgment against defendant ABC with respect to portions of Counts I, II, V and VI, and against defendants Zelnick and Watson with respect to portions of Counts V and VI of the complaint. For a more detailed elaboration of the counts as to which plaintiff seeks summary judgment, see the discussion of the individual counts in parts II–VII, *infra*.

2. The article, which included a prominent copyright notice on the top of the first page, and

article, "The Selling of the President", to defendant ABC's Washington, D.C. headquarters. The article focused on a series of alleged irregularities and improprieties in then-President Jimmy Carter's personal finances. Defendants George Watson, the Washington Bureau Chief of ABC News, and C. Robert Zelnick, the Bureau's Director of News Coverage, thought the allegations sufficiently newsworthy to merit further investigation. Watson therefore directed Zelnick to negotiate with plaintiff concerning the use of the article, and Zelnick did so.

There is no dispute between the parties concerning most of the terms of the verbal agreement reached between plaintiff and Zelnick. ABC was to have exclusive rights to the information contained in plaintiff's article for a period of three weeks (between approximately August 7 to August 27, 1978). During that time, ABC was to investigate the allegations contained in the article with the assistance of plaintiff, who was retained as a consultant at a fee of $500 per week for the three-week period. If ABC broadcast reports based on the article, plaintiff was to be paid $1,000 for each television spot and $100 for each radio spot.

It is also undisputed that both parties substantially performed these terms. Plaintiff provided defendants with exclusive access to his article; he assisted in undertaking additional investigations; and defendants paid plaintiff his $1,500 consulting fee. Defendants also paid plaintiff $2,000 after they broadcast two spot reports—one on the October 19, 1978 edition of "World News Tonight", and the other on the October 20, 1978 edition of "Good Morning America"—concerning alleged discrepancies in President Carter's valuation of farm equipment for federal income and local property tax purposes that had been reported in plaintiff's article.[3]

The contest here revolves primarily around ABC's alleged promise to give plaintiff audio and video credit on any spots based on his article. Plaintiff has produced an August 7, 1978 letter from himself to Zelnick which purports to memorialize the agreement between the parties, and which includes the disputed credit provision. The letter also includes a request that Zelnick notify plaintiff if the letter did not accurately reflect the parties' agreement, and a handwritten note by plaintiff, apparently in reference to a telephone conversation with Zelnick, that the letter accurately reflects the agreement. Defendants, for their part, vigorously deny, both in their papers and in their depositions, that Zelnick or any other ABC employee agreed that plaintiff would receive audio-visual credit on any spots, although they admit that plaintiff sought such credit and that he and Zelnick discussed the matter several times. In the event, ABC never performed the contested term of the agreement—that is, plaintiff never received any sort of on-air credit in the television spots that concerned allegations contained in the article.

It should also be noted that in his most recent amendment to the complaint,[4] plaintiff alleged for the first time that defendants also breached the terms of the agreement requiring that he be paid for each radio and television spot based on his article. Specifically, he claims that ABC broadcast five additional spots based on his article for which he was never paid and on

---

which plaintiff registered with the Register of Copyrights effective October 9, 1981, satisfied the requirements for protection under the Copyright Act, 17 U.S.C. § 101 *et seq.* See 2 Nimmer on Copyright §§ 7.16[A][1], [B], p. 7–111 (1983).

**3.** Specifically, the article alleged that the Carter Warehouse (the Carter family business) had placed a high valuation on recently purchased equipment for federal income tax purposes, thereby obtaining substantial tax benefits for depreciation, and a low valuation on the same equipment for local property tax purposes, to minimize property tax liability. In short, the allegation was that the Carter warehouse sought improperly to limit its federal and local tax liability by filing inconsistent valuations of the same equipment.

**4.** Plaintiff was allowed to amend his complaint (for the second time) in January, 1984.

which he received no on-air credit.[5] Defendants admit both that they have not paid plaintiff for the additional broadcasts, and that they did not provide him with on-air credit, but they deny that they had any obligation to do so.

## II

The two breach of contract claims in Count I of the complaint—one relating to defendants' alleged failure to pay plaintiff for the later television spots based on his article, and the other to their failure to provide him with audio-video credit on all seven television spots—form the heart of this case.[6]

A. Defendants' motion for summary judgment with respect to the failure to credit claim proceeds on the grounds (1) that Zelnick never agreed on behalf of ABC to provide plaintiff with on-air credit, and (2) that even if Zelnick made such a promise, he lacked authority to do so and he therefore he could not bind the other defendants.

■ It appears from the affidavits submitted by defendants and from the deposition testimony that Zelnick did lack actual authority to bind ABC to an agreement to provide on-air credit. But even absent actual authority, an on-air credit promise by Zelnick—if one was made—could have bound ABC if Zelnick possessed apparent authority to do so. See 1 *Restatement (2d) of Agency* §§ 8, 48, 140, 159 (1958). The issues of the precise scope of Zelnick's authority, of plaintiff's contemporaneous belief concerning that authority, and of the reasonableness of his beliefs in light of industry custom and practice all involve unresolved questions of material fact.

Assuming that plaintiff is able to prove that, under agency principles, Zelnick's promises bind ABC, the factual question remains what promises Zelnick actually made with respect to on-air credit to plaintiff. This question involves both intent and credibility—clearly matters for the finders of fact and therefore inappropriate for summary judgment. See *Centronics Financial Corp. v. El Conquistador Hotel Corp.*, 573 F.2d 779, 782 (2d Cir.1978). Defendants' summary judgment motion with respect to the failure to credit claim must accordingly be denied.

B. Defendants' motion with regard to the later newscasts proceeds on two premises: (1) that the claim is barred by the statute of limitations; and (2) that those newscasts concerned only Carter Administration reactions to the original stories and that, as such, they were not covered by the agreement.

Clearly, the claims concerning the five additional October and November, 1978 broadcasts were first asserted well beyond the statute of limitations period. The applicable District of Columbia limitations period, which governs this common-law diversity contract claim,[7] is three years. D.C. Code Ann. §§ 12–301(7) (contracts) and 12–308 (other unenumerated claims). Since the alleged breaches occurred in 1978, plaintiff's assertion of these claims in his 1984 amended complaint came more than two years after the statutory filing period. Accordingly, plaintiff's claims concerning these later broadcasts are time-barred unless saved by a doctrine that mitigates the statutory bar.

■ The Court finds that these particular claims "relate back" under Fed.R.

---

5. The five newscasts for which plaintiff received neither payment nor on-air credit include: an October 20, 1978 "Good Morning America" spot; an October 20, 1978 "World News Tonight" spot; a November 1, 1978 "World News Tonight" spot; a November 21, 1978 "World News Tonight" spot; and a November 22, 1978 "Good Morning America" spot.

6. Plaintiff has moved for summary judgment only with respect to the non-payment claim; defendants have moved for summary judgment on different grounds with respect to each of the two contract claims.

7. See *Guaranty Trust v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Steorts v. American Airlines*, 647 F.2d 194 (D.C.Cir.1981).

Civ.P. 15(c) [8] to the date of plaintiff's original complaint and are therefore timely. Under Rule 15(c), Fed.R.Civ.P., amendments relate back to the date of the original pleading if they arise out of the same "conduct, transaction or occurrence" set forth in the original pleading. In this Circuit (as elsewhere), policies of notice pleading and judicial economy favor the liberal use of relation back as long as the original pleading provided sufficient notice to defendant so that he will not be prejudiced by the assertion of the new claim. See *Columbia Plaza Corp. v. Security National Bank*, 525 F.2d 620, 626 (D.C.Cir.1975); see generally, 6 C. Wright & A. Miller, *Federal Practice and Procedure* Civil § 1497 (1971 and Supp.1984).

Here the later broadcasts occurred close in time to the broadcasts identified in the original complaint, and the breach of contract claims concerning those broadcasts involve failure to credit claims identical to those asserted concerning the earlier identified broadcasts. To be sure, the claim that defendants failed to compensate plaintiff for the later broadcasts represents a different breach than the previously asserted on-air credit breach. But that is not conclusive. Plaintiff's assertion of the on-air credit issue required defendants to review five additional newscast tapes, as they have already done during discovery.[9] That is also the only factual preparation necessary to address the new factual issues posed by the non-payment claim—*i.e.*, whether the television spots mentioned the allegations contained in plaintiff's article.

The crux of all of these claims is the proper construction of one agreement, which is now asserted to have been violated basically in two respects rather than in one. To require defendants to address these additional claims on the merits will neither unduly complicate the case nor prejudice

them. Accordingly, the Court holds that the claims with respect to the latter five broadcasts relate back and are therefore not time-barred.

With regard to the merits of the non-payment claims, there exist genuine, controverted issues of material fact that preclude the granting of summary judgment on this issue to either party. An examination of the broadcast transcripts submitted to the Court reveals that they are indeed concerned with Carter Administration reactions to the earlier broadcasts (for which plaintiff was paid) or are follow-up reports on new developments not reported in plaintiff's article. However, the content of the broadcasts is not alone determinative in assessing this claim. Rather, its resolution requires determinations as to the parties' original intent, the scope of the payment provision of their agreement, and indeed, whether the agreement necessary to form a contract ever existed. All of these are material questions of fact. See *Davis v. Chevy Chase Financial, Ltd.*, 667 F.2d 160, 170–71 (D.C.Cir.1981); *Martin Ice Cream Co. v. Chipwich, Inc.*, 554 F.Supp. 933, 937–39 (S.D.N.Y.1983); see generally, 10A C. Wright & A. Miller, *Federal Practice and Procedure* Civil § 2730.1. Accordingly, both parties' motions for summary judgment on this aspect of the contract claim will be denied.

### III

The Court's conclusion with respect to the contract claim also disposes of the parties' motions regarding the fraudulent misrepresentation claim (Count V of the complaint). To establish the common law tort of fraudulent misrepresentation, a plaintiff must prove that defendants (1) made a false representation (2) with respect to a material fact, (3) with knowledge of its

---

**8.** Although the doctrine of *Erie R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), applies with full force to the District of Columbia as well as to the states, see *Anchorage-Hynning & Co. v. Moringiello*, 697 F.2d 356, 360–61 (D.C.Cir.1983), no real *Erie* conflict exists here, since District of Columbia law provides that the Federal Rules of Civil Procedure shall govern proceedings in local courts. See D.C.Code Ann. § 11–946.

**9.** See Exhibits 3 (Attachments B, C, and D) and 4 (Attachments A and B) to defendants' motion for summary judgment.

falsity, (4) with the intent to deceive plaintiff, and (5) that plaintiff acted in reliance on the false representation. *Nader v. Allegheny Airlines*, 512 F.2d 527, 541 n. 32 (D.C.Cir.1975), *rev'd on other grounds*, 426 U.S. 290, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Rothenberg v. Aero Mayflower Transit Co., Inc.*, 495 F.Supp. 399, 406 (D.D.C.1980). Plaintiff's allegations, read as they must be in the light most favorable to him, as well as the deposition testimony, indicate that, if plaintiff's claims that defendants agreed to provide him with on-air credit and payment even for Carter Administration "reaction" stories are true, then plaintiff may be able to establish the elements of the fraudulent misrepresentation claim. Since, as indicated, the facts concerning the provisions of plaintiff's agreement with defendants remain disputed, the fraudulent misrepresentation claim, which largely turns on the same facts as the contract claim, is similarly unripe for summary judgment. Accordingly, both parties' summary judgment motions must and will be denied as to this claim.

Plaintiffs common-law claim of negligent misrepresentation (Count VII), to the effect that defendants "owed plaintiff a duty not to mislead him concerning their proposed use of his proprietary, copyrighted material," Complaint at paragraph 56, is similarly unripe for summary judgment. Defendants have moved for summary judgment on the grounds that no misrepresentations were made. However, as noted above, the nature and truth of the representations made to plaintiff remain very much contested issues of material fact. Accordingly, defendants' motion for summary judg-

ment will be denied with respect to this claim.

## IV

Both parties have moved for summary judgment on the copyright claim: plaintiff on the ground that defendants copied his work without authorization by broadcasting infringing news spots without compensating him, and defendants on the basis that no reasonable jury could find that defendants infringed the copyright.

▮ It is well recognized that the federal copyright laws [10] provide only limited protection for news reports. Although a reporter's mode of expression is protected by copyright, the facts reported are not themselves so protected. See *Harper and Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 202, *cert. granted*, —— U.S. ——, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984); *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365 (5th Cir.1981); see generally, 1 *Nimmer on Copyright* § 2.11 (1983).[11] Similarly, the Copyright Act does not extend copyright protection to ideas contained within the article.[12] The Act thus strikes a careful balance, protecting authors' original expression without impeding the public's access to information and ideas.

▮ A comparison of plaintiff's articles with transcripts of the allegedly infringing newscasts compels the conclusion that no copyright infringement occurred. To be sure, the later newscasts reported some facts concerning former President Carter's taxes that were similar [13] to those reported by plaintiff. But such material was dis-

---

**10.** The Copyright Act is codified at 17 U.S.C. § 101 *et seq.*

**11.** As Professor Nimmer has explained:

This may be understood as an application of the requirement of originality. No one may claim originality as to facts. Facts may be discovered, but they are not created by an act of authorship. One who discovers an otherwise unknown fact may well have performed a socially useful function, but the discovery does not render him an "author" in either the constitutional or statutory sense.

1 Nimmer on Copyright § 2.11[A] at 2–157–58 (1983).

**12.** *Harper and Row, supra,* 723 F.2d at 202 n. 7.

**13.** For example, plaintiff's article states that President Carter's federal income tax return valued the farm equipment at $658,000.00, while the October 19, 1978 "World News Tonight" report indicated that the equipment was valued at "just under $700,000.00." Similarly, plaintiff reports that the Carter Warehouse valued the equipment at $425,000.00 for local property tax purposes, while the ABC figure is $367,000.00.

tinctly subordinate to the theme of the newscasts. Plaintiff's article contains numerous allegations of irregularities and improprieties concerning Carter family finances, and it suggests that loans received from Saudi Arabian and domestic sources constitute conflicts of interest and raise substantial doubts about the President's integrity. The ABC broadcasts, by contrast, reported only a single allegation similar to those raised in the article, and, significantly, they raised no conflict of interest questions whatsoever. The broadcasts reported numerous additional facts based on ABC's own investigations,[14] and their thrust was to question the consistency of the President's actions with his statements about the federal tax system.

In short, the references to plaintiff's work were entirely incidental to the publication of ideas and news reports of benefit to the public. To hold that plaintiff had a copyright on this material would be inconsistent with copyright law precepts and entirely inimical to First Amendment principles. Defendants' motion for summary judgment will accordingly be granted with respect to Count II of the complaint.[15]

### V

Defendants have moved for summary judgment with respect to the unfair trade practices claims (Count III) and the unfair competition claims (Count IV) on the basis that these common law claims are pre-empted by the Copyright Act.

■ Section 301 of the Copyright Act, 17 U.S.C. § 301, provides a broad statutory basis for the pre-emption of state claims equivalent to copyright that extend to works within the scope of federal copyright law.[16] The purpose of this broad statutory pre-emption scheme is to further the Copyright Act's goal of encouraging contributions to recorded knowledge by precluding the use of state law to prevent the copying of material that Congress has determined should be left in the public domain. See *Sears, Roebuck & Co. v. Stiffel Co.,* 376 U.S. 225, 84 S.Ct. 784, 11 L.Ed.2d 661 (1964); *Hoehling v. Universal City Studios, Inc.,* 618 F.2d 972, 980 (2d Cir.1980).

■ Plaintiff's copyrighted article is plainly within the subject matter of the Copyright Act. The seventeen-page article is an "original work of authorship fixed in a tangible medium of expression". 17 U.S.C. §§ 102(a), 301.[17] It is also clear from the allegations of the complaint that the thrust of his unfair competition and unfair trade practices charges is that ABC improperly made unauthorized use of the material contained in his article and failed to provide him with compensation and on-air credit therefor. The rights to control the use or reproduction of copyrighted

**14.** Plaintiff does not dispute that defendants undertook additional factual investigations of the charges contained in his article.

**15.** Notwithstanding such decisions as *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir.1946), the courts have in recent years recognized the appropriateness of summary judgment as to copyright claims where, as here, the alleged similarity relates to non-copyrightable elements of plaintiff's work. See, *e.g., Hoehling v. Universal City Studios,* 618 F.2d 972, 977 (2d Cir.1980).

**16.** Section 301(a) of the Copyright Act provides as follows:

On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression ad come within the

subject matter of copyright as specified by sections 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.

17 U.S.C. § 301(a). Thus, "[a]s long as a work fits within one of the general subject matter categories of Sections 102 and 103, the [Act] prevents the States from protecting it even if it fails to achieve Federal statutory copyright." House Report No. 94–1476 at 131, reprinted in 5 U.S.Code Cong. and Admin.News 5659 at 5747 (1976).

**17.** That plaintiff could not prevail on his copyright claim, see *supra,* in no way affects this conclusion, as the two claims involve distinct inquiries. See *Harper and Row,* 723 F.2d at 200; cf. 1 Nimmer, *supra,* § 2.03[E] at 2–33.

work are explicitly protected by section 106 of the Copyright Act.[18] Although section 106 does not explicitly protect the right of attribution of authorship, assertion of such a claim in an otherwise pre-empted common law action will not save the common law claim from pre-emption. See *Suid v. Newsweek Magazine, Inc.,* 503 F.Supp. 146, 149 (D.D.C.1980).

■ Plaintiff's unfair competition and unfair trade practices claims thus fall squarely within the pre-emption provisions of § 301 of the Copyright Act. Accordingly, defendants' motion for summary judgment will be granted with respect to Counts III and IV of the complaint.

## VI

■ Plaintiff has alleged in count VI that the non-corporate defendants committed numerous acts of wire and mail fraud in furtherance of their alleged scheme to defraud him, and that they are therefore liable under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961 *et seq.* To prevail on his RICO claim, plaintiff is required to prove (1) the existence of an enterprise (2) affecting interstate commerce (3) with which defendants were associated (4) and in the affairs of which they participated (5) through a pattern of racketeering activity. *Martin-Trigona v. Smith,* 712 F.2d 1421, 1426 n. 6 (D.C.Cir.1983). Certainly, as defendants concede, the first four elements

are satisfied here. It is equally clear, however, that plaintiff has not satisfied the fifth element.[19]

■ Plaintiff has failed to develop any facts tending to prove the two predicate criminal acts necessary to establish the requisite pattern of racketeering activity, and his RICO claim therefore cannot stand. 18 U.S.C. § 1961(5); see *United States v. Swiderski,* 593 F.2d 1246, 1247 (D.C.Cir. 1978), *cert. denied sub nom McGowan v. United States,* 441 U.S. 933, 99 S.Ct. 2056, 60 L.Ed.2d 662 (1979). Assuming the truth of plaintiff's allegations that Zelnick engaged in fraudulent misrepresentations in their August 1, 1978 telephone conversation—allegations which, it may be noted, are very much disputed—this conversation between plaintiff in Virginia and Zelnick in the District of Columbia could in theory be found to be within the federal wire fraud statute,[20] which constitutes one of the predicate RICO felonies.[21] However, despite his allegations that defendants engaged in numerous interstate telephone conversations with each other in furtherance of the fraud, extensive discovery has produced not the slightest factual support for these claims. The Court will not require defendants to contest at trial so serious a charge on grounds which are so flimsy as to be non-existent.

Similarly defective is the allegation that the ABC television news spots constituted

---

**18.** Section 106 of the Copyright Act provides, in pertinent part:

Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
(1) to reproduce the copyrighted work ...
(2) to prepare derivative works ......
(3) to distribute copies .........
(4) in the case of literary, musical, dramatic, and choreographic works, ... to perform the copyrighted work publicly; and
(5) in the case of literary ... works, to display the copyrighted material publicly.

**19.** The Court also assumes for present purposes, without deciding the question, that an organized crime link is not required to establish a civil RICO claim. See *Moss v. Morgan Stanley,* 719 F.2d 5, 21 (2d Cir.1983).

**20.** The federal wire fraud statute, 18 U.S.C. § 1343, provides that:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined not more than $1,000 or imprisoned not more than five years, or both.

**21.** See 18 U.S.C. § 1961(1)(B).

acts of wire fraud: if any fraud occurred, it was consummated prior to the broadcasts, when defendants obtained plaintiff's services and access to his article, and the broadcasts therefore cannot be considered acts in the furtherance or execution of the alleged fraudulent scheme, as is required for coverage under the wire fraud statute. See 18 U.S.C. § 1343; *United States v. Alston,* 609 F.2d 531, 536 (D.C.Cir.1976). The Court will therefore grant summary judgment to defendants with respect to this claim.[22]

## VII

Finally, plaintiff claims that defendants converted his alleged trade secrets (Count VIII). Defendants' motion argues (1) that the information contained in the article does not constitute a trade secret, and (2) that plaintiff's intangible property rights in the article cannot be the subject of conversion.

■ Plaintiff's contention that his article, or the information contained therein, constituted a trade secret is frivolous. Plaintiff's compilation of facts, the overwhelming majority of which consisted of publicly available information, cannot reasonably be characterized as a "formula, pattern, device or compilation of information" regularly used in his business. See *Ashland Oil, Inc. v. FTC,* 409 F.Supp. 297, 303 (D.D.C.), *aff'd,* 548 F.2d 977 (D.C.Cir. 1976) (citing the widely used definition in 4 *Restatement of Torts* § 757, comment (b) (1939)); see also, 1 *Milgrim on Trade Secrets* § 2.01 at 2–2—2–8 (1984). The compilation of facts was not used by plaintiff as a means for conducting his business as an investigative reporter; rather, it was the product of his efforts as a reporter.[23]

Beyond that, neither the article nor the facts contained therein were secret. At the time plaintiff showed the article to Zelnick, he had already shown it to editors at *Penthouse* magazine, and earlier drafts had been shown to several other journalistic organizations. Indeed, most of the facts contained in the article were available in the public record; ascertainment of these facts certainly required effort, but hardly the sort of effort and expense normally associated with the development of trade secrets. See *Ashland Oil, supra,* 409 F.Supp. at 303. Defendants' motion for summary judgment will accordingly be granted as to Count VIII.[24]

## VIII

■ As the foregoing analysis has suggested, plaintiff has transformed a relatively simple contract claim into major federal litigation through the addition of numerous common law and federal statutory claims, most of which are legally unsupportable. Accordingly, defendants' motion for summary judgment will be granted with respect to these inappropriate additional claims (set forth in counts II, III, IV, VI, and VIII of the complaint), which will be dismissed. The parties' motions for summary judgment will be denied as to the contract and misrepresentation claims (set forth in counts I, V, and VII), which involve factual disputes appropriate for resolution at trial. It is the Court's expectation that, now that the scope of this lawsuit has been properly narrowed, a prompt resolution can be anticipated. Accordingly, the Court will schedule a status call in order that the Court and the parties can set final discovery cut-off, pretrial, and trial dates, and

---

**22.** The Court notes also that Judge Johnson of this Court has recently held that a criminal conviction is a necessary predicate for civil RICO claims, *Berg v. First American Bankshares, Inc.,* 599 F.Supp. 500, 505–506 (October 19, 1984). The lack of such a conviction against defendants may thus form an alternative ground for dismissing plaintiff's RICO claim.

**23.** Even if it were to be assumed that plaintiff used some of the information to prepare later

articles in his business as a reporter, such irregular, limited use is inconsistent with generally accepted views as to the definition of trade secrets. See Milgrim, *supra,* at 2–8.

**24.** The Court also notes that the common-law conversion claim appears to be pre-empted and precluded by the Copyright Act for the reasons discussed in Part V, *supra.* See *Harper and Row,* 723 F.2d at 200–01.

bring this case to an expeditious resolution on the merits.