548 F.2d 977
 179 U.S.App.D.C. 22, 1976-2 Trade Cases 61,088
 ASHLAND OIL, INC., Appellant,
v.
FEDERAL TRADE COMMISSION et al.
ASHLAND OIL, INC.
v.
FEDERAL TRADE COMMISSION et al.
Appeal of John E. MOSS, Chairman, Subcommittee on Oversight
and Investigations of the Committee on Interstate
and Foreign Commerce, United States
House of Representatives.
 Nos. 76-1174, 76-1304.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 10, 1976.
Decided Sept. 20, 1976.
Rehearing Denied March 2, 1977.
 
 Ray S. Bolze, Washington, D.C., with whom Roger C. Simmons, Washington, D.C., was on the brief for appellant in No. 76-1174 and appellee Ashland Oil, Inc., in No. 76-1304.
 Joseph A. Califano, Jr., Washington, D.C., with whom Richard M. Cooper and Benjamin W. Heineman, Jr., Washington, D.C., were on the brief for appellant in No. 76-1304 and appellee Moss in No. 76-1174.
 Edwin E. Huddleson, III, Atty., Dept. of Justice, Washington, D.C., with whom Rex E. Lee, Asst. Atty. Gen., Earl J. Silbert, U. S. Atty., Robert J. Lewis, Gen. Counsel, F.T.C., Gerald P. Norton, Deputy Gen. Counsel, Gerald Harwood, Asst. Gen. Counsel, William A. E. Doying, Atty., F.T.C. and Leonard Schaitman, Atty., Dept. of Justice, Washington, D.C., were on the brief for appellee, F.T.C., and others in No. 76-1174.
 Before BAZELON, Chief Judge, Mac- KINNON and ROBB, Circuit Judges.
 Opinion Per Curiam.
 
 
 1
 Dissenting opinion filed by Circuit Judge MacKINNON.
 
 PER CURIAM:
 
 2
 This action was brought by Ashland Oil, Inc. to enjoin the Federal Trade Commission from transferring information obtained from Ashland to the House Subcommittee on Oversight and Investigation of the Committee on Interstate and Foreign Commerce. The Subcommittee Chairman, Rep. John E. Moss, intervened. The information in question consists of Ashland's reserve estimates for all its natural gas leases and contracts on federal lands. All parties concede this information is a "trade secret" of great competitive value to Ashland. It is also of great interest to the Subcommittee for whatever light it may cast on the causes of the current natural gas shortage. See generally FTC v. Texaco, 170 U.S.App.D.C. 323, 517 F.2d 137 (1975), vacated and rehearing en banc ordered (Feb. 6, 1976).
 
 
 3
 Judge Corcoran denied Ashland's request for preliminary and permanent injunctive relief in a comprehensive opinion. 409 F.Supp. 297 (1976). Ashland's central argument is that experience shows that if the information is made available to Congress, it will inevitably be "made public." This in turn is alleged to violate the prohibition in 15 U.S.C. § 46(f) against the FTC's "mak(ing) public" trade secrets.[1] Judge Corcoran rejected this argument on the grounds that "the courts must presume that the committees of Congress will exercise their powers responsibly and with due regard for the rights of affected parties," 409 F.Supp. at 308. Concluding that Ashland's showing was insufficient to overcome this presumption, the court held that no likelihood of irreparable injury warranting an injunction had been established, id., 309.
 
 
 4
 We affirm, essentially for the reasons stated in Judge Corcoran's opinion.
 
 
 5
 * No substantial showing was made that the materials in the possession of the FTC will necessarily be "made public" if turned over to Congress. Therefore, we need not decide what application, if any, 15 U.S.C. § 46(f) might have if it were evident that Congress intended to "make public" trade secrets. At a minimum, we think it is clear that absent such a showing, 15 U.S.C. § 46(f) does not preclude the FTC from transmitting trade secrets to Congress pursuant either to subpoena or formal request.[2]
 
 II
 
 6
 Unlike the dissent, we find it unnecessary to decide whether the subpoena issued for the data was valid under House Rules. The FTC's decision to turn over the materials in question was not based on and in fact predated issuance of the subpoena. On October 29, 1975, Congressman Moss, in his capacity as Subcommittee Chairman, wrote to the FTC requesting all data gathered by the Commission relating to extensions of oil and gas leases on federal lands. J.A. 36-37. On November 18, 1975, Chairman Engman of the FTC responded that "(t)he Commission has determined to grant your request" and " . . . will deliver the information requested on November 28, 1975." J.A. 38-39. By telephone and confirming letter of November 18, the FTC notified Ashland that the agency planned to release the requested information to the Subcommittee. J.A. 40. Subsequently Ashland filed this action, and on November 24, Judge Corcoran issued a temporary restraining order precluding the turnover. J.A. 49-50. Only then, on December 2, 1975, did the Subcommittee issue its subpoena. J.A. 52-53.
 
 
 7
 It is clear that but for the temporary restraining order, the FTC would have submitted Ashland's data to the Subcommittee; indeed, on November 28, the FTC did deliver to the Subcommittee similar data from other companies, which had not challenged the release in court. J.A. 60. The dissent does not, and cannot deny that the FTC action challenged in this case was bottomed on a Congressional request for the data, not the subsequent subpoena. Nor does the dissent suggest that 15 U.S.C. § 46(f) must be read differently as a matter of law where a request, rather than a subpoena, is involved. The dissent's entire discussion of the subpoena rests solely on an interpretation of statements made by Government counsel during oral argument.[3] As the dissent interprets it, this exchange indicates that "the legal position of the United States before this Court is that any presently intended compliance is based solely on the subpoena, and on no other request." Dissent, 5.
 
 
 8
 In our opinion, this is a strained reading of what was said at argument. Contrary to the dissent's interpretation, government counsel never stated that the FTC had repudiated its prior position and that "any presently intended compliance is based solely on the subpoena." Quite the contrary, the brief filed by the Department of Justice on behalf of the FTC clearly states that "whether or not the subcommittee subpoena is technically valid (and it is), 15 U.S.C. § 46(f) obligates the FTC to comply with these official Congressional requests for information." Brief at 13. Counsel did urge that the court need not reach this back-up argument, since in his view the subpoena was valid: "We ask the court to confine its decision to the facts of this case, where there is a valid subpoena." Tr., 29. But that is a long way from conceding that if the court rejected counsel's opinion that the subpoena was valid (as the dissent does), it must ignore the grounds relied upon by the FTC when it acted originally, and upon which it still felt "obligated" to act.
 
 
 9
 The reason counsel asked the court to uphold the FTC based on the subpoena is clear from the colloquy. Counsel forthrightly acknowledged that there may be some latent disagreement between the Department of Justice and the FTC regarding the obligation of regulatory agencies to comply with mere Congressional requests for information.[4] Thus, the dissent's repeated insistence on a single, unitary "legal position of the United States" is belied by counsel's explicit statement that the FTC and the Department of Justice may hold different views as to the correct interpretation of 15 U.S.C. § 46(f).[5] Far from indicating that the United States had "abandoned" the view adopted by the FTC, counsel articulated the FTC's position and then stated that the Department of Justice wished to "reserve" its own position on the matter. Tr., 30. In our view, counsel's statements at oral argument meant no more and no less than what they said: that the Department of Justice felt it was "unnecessary to reach", Tr., 29, the request because it maintained that the subpoena was valid.
 
 
 10
 Even if government counsel had attempted to disavow the basis on which the FTC acted and it is clear from the foregoing that he did not his statements could not bind the court to ignore the rationale on which the FTC's decision was actually based. No principle of administrative law is more firmly established than that a court must review discretionary actions in terms of the rationale on which the agency acted, rather than "accept appellate counsel's post hoc rationalizations," Burlington Truck Lines v. United States,371 U.S. 156, 169, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962); SEC v. Chenery Corp.,318 U.S. 80, 88, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Without citation of authority, the dissent would go far beyond merely accepting appellate counsel's post hoc rationalizations and would hold that such rationalizations may actually preclude the court from considering the basis on which the agency in fact acted.[6] There is no support for this novel doctrine. The analogy that comes closest is a confession of error by appellate counsel, but even there, it is settled that such a confession of error is not binding.[7]
 
 
 11
 Here, of course, the Department of Justice does not purport to "confess" that FTC committed legal error in deciding to turn over the materials to Congress; it merely "reserves" its own position on whether the FTC was obligated to do so.
 
 III
 
 12
 Since we do not read the district court's opinion as finding Congressman Moss ever broke a promise of confidentiality, we have no occasion to address the grounds of his separate appeal.
 
 
 13
 We extend the stay previously entered for a period of 15 days from the date hereof to enable the parties to seek a further stay from the Supreme Court of the United States, if they are so advised.
 
 
 14
 So ordered.
 
 MacKINNON, Circuit Judge (dissenting):
 
 15
 The majority opinion strips the Department of Justice of its litigating authority, effectively repeals 28 U.S.C. § 516, and wrests all substance from the role of oral argument in federal appellate court.
 
 
 16
 The majority opinion states that the very valuable trade secrets here involved may be surrendered to Congress "pursuant either to subpoena or formal request." Majority opinion, p. 979. The first trouble with this declaration is that the subpoena here is invalid under the House Rules. The second is that the Government at oral argument based its position solely on the subpoena and repeatedly refused to defend any claim that the agency had a right to comply with the "formal request," so that, with respect to a request short of a subpoena, the majority opinion is based upon a position that is not before it and which was expressly disclaimed.
 
 
 17
 The Government stated at oral argument that it was defending only the validity of the subpoena. That was the only issue the Government argued, and yet the majority would dispose of the case without even addressing the point. The reason for this is that the majority recognize that the subpoena is invalid, for the reasons hereafter stated. Given the invalidity, the case must be disposed of in appellant Ashland's favor because the Government relies on no other basis for surrendering the documents.
 
 
 18
 The majority opinion also misstates both the facts of the Government's presentation at oral argument and the law with respect to the authority of the Department of Justice over the conduct of agency litigation.
 
 I. THE FACTS AND THE THRESHOLD ISSUES
 
 19
 By letter dated October 6, 1975, Congressman John E. Moss, writing in his capacity as a Member of Congress, requested the FTC to disclose data which detailed the location of Ashland's natural gas reserves, and which Ashland had submitted to the FTC. The request was treated as a request for information under the Freedom of Information Act, 5 U.S.C. § 551 et seq., and was denied (J.A. 32-35). Subsequently, on October 29, 1975, this time in his official capacity as Chairman of the House Subcommittee on Oversight and Investigations of the Committee on Interstate and Foreign Commerce, Mr. Moss again requested the data, to which the Commission responded that the data would be supplied (J.A. 36-39). Ashland filed this case in the District Court on November 24, 1975, seeking an injunction against Commission compliance with the request. On December 2, 1975, the full House Committee on Interstate and Foreign Commerce issued a subpoena duces tecum to the Commission Chairman for the data. On February 2, 1976, the District Court granted the Commission's motion to dismiss, considering Ashland's argument that Commission disclosure is barred by 15 U.S.C. § 46(f), but holding that there had been no showing of irreparable harm (J.A. 428-49). Ashland appeals the February 2 order. Mr. Moss, as intervening defendant, moved the District Court to amend the February 2, 1976, ruling to delete language alleged to imply that the Subcommittee or Mr. Moss had in the past breached obligations to handle information confidentially. The motion was denied on February 9, 1976 (J.A. 532). Mr. Moss appeals that order.
 
 
 20
 15 U.S.C. § 46(f) provides that the Commission shall have the power:
 
 
 21
 To make public from time to time such portions of the information obtained by it . . . except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use. (Emphasis added).
 
 
 22
 Although Ashland alleges some past violations of confidentiality by defendants and states that "there has been no promise or commitment that Ashland's trade secret data would be given confidential treatment," (J.A. 446), these allegations do not constitute a substantial showing that the materials in the possession of the Commission will necessarily be "made public" if turned over to Congress. Therefore, it is not necessary to decide what application, if any, 15 U.S.C. § 46(f) might have if it were evident that Congress intended to "make public" trade secrets. At a minimum it is clear that absent such a showing 15 U.S.C. § 46(f) does not preclude the FTC from transmitting trade secrets to Congress, pursuant to subpoena.
 
 
 23
 Since the District Court's opinion is not to be read as finding Congressman Moss ever broke a promise of confidentiality, there is no occasion to address the grounds of his separate appeal.
 
 
 24
 However, this leaves two issues for resolution: whether the subpoena itself was validly issued, and whether, if the subpoena is invalid, the House subsequently ratified the subpoena.
 
 II. THE GOVERNMENT'S POSITION
 
 25
 At the very outset of oral argument, Government counsel firmly stated the position of the United States:
 
 
 26
 MR. HUDDLESON[1]: Chief Judge Bazelon, may it please the court, the central issue in this case is whether section 46(f) of the Federal Trade Commission Act gives the Commission any legal basis or any discretion to refuse to comply with a valid Congressional subpoena for trade secret information in the Commission's possession. Our position is two-fold: we submit there is no imminent threat of irreparable injury warranting an injunction and that on the merits neither section 46(f) nor the Constitution prohibits the Commission from complying with a valid Congressional subpoena for trade secret information. I want to address the merits . . .
 
 
 27
 JUDGE ROBB: Well, would it make any difference whether there was a subpoena or not, so long as the Subcommittee formally requested this material?
 
 
 28
 MR. HUDDLESON: We ask the court to confine its decision to the facts of this case, where there is a valid subpoena. Now, we ask the Court to leave for another day any possible question concerning the Commission's legal obligation with respect to Congressional requests, as opposed to subpoenas for information . . .
 
 
 29
 JUDGE ROBB: I know you ask us to do that, but we've got a right to think about it, and I'm asking you for your opinion.
 
 
 30
 MR. HUDDLESON: We think that it's unnecessary to reach the issue.
 
 
 31
 JUDGE ROBB: All right. All right, you don't want to answer the question.
 
 
 32
 MR. HUDDLESON: The answer to your question is that the view of the Federal Trade Commission, that they have expressed, is that they feel obligated to comply with Congressional requests. The other independent . . .
 
 
 33
 JUDGE ROBB: I take it you allow me to have my opinion on it.
 
 
 34
 MR. HUDDLESON: Yes, Your Honor. I hope to convince you that the subpoena here is clearly valid and that it's unnecessary to reach that issue.
 
 
 35
 JUDGE ROBB: For your information, I can't see that it makes any difference. Go ahead.
 
 
 36
 MR. HUDDLESON: Well, in the view of the . . .
 
 
 37
 JUDGE ROBB: No matter what the FTC thinks.
 
 
 38
 MR. HUDDLESON: In the view of the other independent regulatory agencies and the Justice Department, it might make a difference. We take no position on the matter; we want to reserve our position on that point.
 
 
 39
 Taped transcript of oral argument, May 10, 1976 (conformed to tape recording) (emphasis added).
 
 
 40
 The only possible interpretation of the foregoing is that the legal position of the United States before this court is that any presently intended compliance is based solely on the subpoena, and on no other request.
 
 
 41
 In light of the actual statements at oral argument reproduced above, it is obvious that this was not a case of incidental mention that the subpoena was valid. The statements did not occur during a mere "exchange" in the midst of oral argument; the Government in the first sentence of its opening statement firmly said it was proceeding only on the ground of "a valid Congressional subpoena." That was its predetermined position prior to any question whatsoever from the bench. Thus, subsequent attempts in the majority opinion to gratuitously label the position that the FTC was obligated to comply with congressional requests as a "back-up argument," and that the FTC "still felt (it was) obligated" to act on the mere request misstates the factual situation before this court at oral argument. The legal position of the FTC in the litigation was controlled by the Department of Justice.
 
 
 42
 The position of the United States in this litigation has been set by the Department of Justice, pursuant to its statutory role and duty under 28 U.S.C. § 516:
 
 
 43
 Except as otherwise authorized by law, the conduct of litigation in which the United States, an agency, or officer thereof is a party, or is interested, and securing evidence therefor, is reserved to officers of the Department of Justice, under the direction of the Attorney General.
 
 
 44
 Burlington and Chenery Corp., cited by the majority, supra, are not apposite. The majority relies on these cases for the proposition that appellant counsel cannot alter the basis of an agency's action, i. e., indulge in post hoc rationalization. Burlington relates exclusively to an instance in which the agency involved did not properly exercise its own expertise, or did not properly explain such exercise, and in which appellant counsel tried to operate in that area of expertise in order to justify the agency's action. In Burlington the area of expertise was the Interstate Commerce Commission's analysis of the proper remedy in providing trucking service in the face of a labor dispute. 371 U.S. at 156-69, 83 S.Ct. 239. In Chenery Corporation, the SEC on appeal attempted to justify its approval of a plan of corporate reorganization on grounds which it had disavowed in acting on the plan.
 
 
 45
 In the case before us, the FTC never turned over any information on the mere request, and there is no issue of FTC expertise. On the contrary, the expertise involved is precisely the expertise of the Department of Justice: the orderly and consistent management of the litigation of the widely diverse agencies and departments of the United States Government. The issue in this case is a strictly legal one: the standards for conveying information between separate branches of government, a litigation matter squarely within the province of the Department of Justice. The agency is bound by the position taken by the legal representation of the Government.
 
 
 46
 The majority ponder the FTC's position and refer gingerly to the actual position stressed by Government counsel (majority opinion, pp. 980-981), implying that the Department of Justice does not control the litigation and legal position of the United States here, and implying that the Department of Justice is not empowered to speak through its attorney, in court, and on the record. 28 U.S.C. § 516 governs; the Department of Justice controls here, and, as to the role of oral argument, I am hard put to imagine what more the majority requires. Probably the Attorney General will have to arrange to appear personally in all cases.
 
 
 47
 The position of the Government, that it was claiming a right only to comply with a proper subpoena, is nonetheless valid for its having been the only position taken at oral argument. The Department of Justice and the Attorney General are certainly to be accorded the right so to delimit their argument, in the course of preparing the coordinated position of the United States. There is no prejudice whatsoever to appellants in the delimitation, since the validity of the subpoena was asserted in the Government's brief. (Government Br. at 13, reproduced supra ), and there is no question that litigants may, in the course of proceedings, abandon arguments previously raised. Abrams v. American Security & Trust Co., 72 App.D.C. 79, 80, 111 F.2d 520, 521 (1940). The actual merits of the case should thus be addressed.
 
 III. THE SUBPOENA
 
 48
 The subpoena directed the Chairman of the Federal Trade Commission the next day to deliver to the Subcommittee, inter alia, all records in its possession relating to oil and gas lease extensions on federal lands which involve Ashland Oil Co.
 
 
 49
 The Subcommittee claims it complied with the Rules of the House in issuing such subpoena and that accordingly the subpoena is valid. In particular it relies on Rule XI, cl. 2. (m), which provides:
 
 
 50
 (1) For the purpose of carrying out any of its functions and duties under this rule and Rule X . . . any committee, or any subcommittee thereof, is authorized (subject to subparagraph (2)(A) of this paragraph) . . .
 
 
 51
 (B) to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents
 
 
 52
 as it deems necessary. . . .
 
 
 53
 (2)(A) A subpena may be issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of any investigation or activity or series of investigations or activities, only when authorized by a majority of the members of the committee . . . .
 
 
 54
 Rules of the House of Representatives, 94th Congress. (Emphasis added).
 
 
 55
 A resolution of the Committee on Interstate and Foreign Commerce, which the Subcommittee claims authorized it to issue the subpoena in question, was offered on April 17, 1975, by Mr. Staggers, Chairman of the Committee. The resolution provided:
 
 
 56
 RESOLVED, that in accordance with Rule XI, Clause 2. (m)(1) of the Rules of the House of Representatives, the Subcommittee on Oversight and Investigations, . . . (is) authorized to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as they deem necessary in the conduct of such Subcommittees of any investigation or activity or series of investigations or activities within their jurisdiction as set forth in Rule X, Clause 1(b) of said House Rules and the Rules and procedures of the Committee on Interstate and Foreign Commerce. (Emphasis added).
 
 
 57
 (J.A. 407). In that Congress, at that time, 43 members constituted the Committee on Interstate and Foreign Commerce.[2] A "majority of the members of the Committee" would thus be 22 members. Committee records, however, disclose that only 21 members of the Committee voted for the resolution.[3] This is one member short of the required majority of the members of the Committee. Thus the subpoena issued by the Subcommittee was not properly authorized unless the rule is to be construed other than according to its plain meaning, as contended by the Subcommittee chairman, Congressman Moss. His brief and memorandum assert that his Subcommittee has duly authorized, in conformance with the above quoted provision of Rule XI, cl. 2. (m), 94th Congress, to issue the subpoena because the authorizing resolution was "passed by a majority of a quorum of the full committee." Supplemental Memorandum of Mr. Moss, filed May 14, 1976, p. 2 (emphasis added).
 
 
 58
 In the House of Representatives a quorum consists of a "majority of the committee."[4] There is no question there that a "majority of the committee" means of the full committee. Thus 22 members would constitute a quorum and, according to the construction the Subcommittee here advances, 12 members of the 43-member committee would be "a majority of a quorum" and fully able to authorize a Subcommittee subpoena if only 22 members were present. The Subcommittee thus contends that a "majority of the committee" means 22 members in one rule and that "a majority of the members of the Committee" could mean 12 members in the other rule. The Supplemental Memorandum of the Subcommittee also argues at p. 2:
 
 
 59
 The House of Representatives has consistently interpreted "a majority of the members of the Committee" (House Rule XI, § 2(m)(2) (94th Congress)) to mean a majority of a quorum present and voting. (See attached correspondence between Congressman Moss and Speaker of the House, the Honorable Carl Albert; App. 142 (affidavit of Michael Lemov P 7)).
 
 
 60
 In support of the above position the Supplemental Memorandum attaches a copy of a letter of May 13, 1976 from the Honorable Carl Albert, M.C., Speaker of the United States House of Representatives, to the Chairman of the Subcommittee, the Honorable John E. Moss, M.C. The text of this letter in its entirety reads as follows:
 
 Dear Mr. Chairman:
 
 61
 I have received your letter of May 11, 1976, regarding the interpretation of House Rule XI, clause 2(m), which authorizes committees of the House of Representatives to issue subpenas.
 
 
 62
 There is no indication in the legislative history of the rule, which was adopted in the 93d Congress to become effective January 3, 1975, of any intent to require a different procedure for voting on subpenas than on other votes taken in House committees. Under the customary and correct practice of the House of Representatives, which derives its rule-making authority from the Constitution (Article I, Section 5, which provides that a majority of the House shall constitute a quorum for doing business), committee action is valid which is authorized by a majority of those Members voting, a quorum being present. It would create an anomalous situation to require a more stringent standard for authorizing the issuance of a subpena than for finding a witness in contempt of a committee for refusing to honor such a subpena, or for taking a final committee action in ordering a measure or matter reported to the House.
 
 
 63
 This letter correctly states that in the House of Representatives a majority of legal votes cast, a quorum being present, is generally sufficient to carry a proposition. This can be proved by a cursory examination of the proceedings in the House over any long or short period of time. And the "Rules of the House are the rules of its committees and subcommittees so far as applicable . . ."[5] This is also the clear rule of the common law.[6] Moreover:
 
 
 64
 Where a majority or other proportion of votes is required without specifying whether the vote refers to the entire membership or to the members present, or to the members present and voting, the general rule is that the proportion refers to the number present and voting.
 
 
 65
 Mason's Legislative Manual, Sec. 510, Para. 2 (1970), and cases cited therein. However:
 
 
 66
 Where a . . . controlling provision of law requires a majority vote of the entire membership or of all members present or any other number or proportion to take action; that vote must be obtained, and a vote less than that number, although a majority of those present and voting, a quorum being present, is not sufficient.
 
 
 67
 Mason's Legislative Manual, Sec. 511, Para. 1 (1970) (emphasis added).[7]
 
 
 68
 There are many instances in which controlling provisions of law and the rules require something more than a majority vote of a quorum. Several instances appear in the Rules of the House of Representatives. Rule XXVII, cl. 1, for suspension of rules requires "a vote of two-thirds of the Members voting, a quorum being present . . . ."; Rule XXIV, cl. 7, provides that the normal business of the House shall not be altered "unless the House by a two-thirds vote on motion to dispense therewith shall otherwise determine"; Rule XXIV, cl. 6, for a similar purpose requires a "two-thirds vote on motion to dispense therewith . . ."; and Rule XI, cl. 4. (b) to call up for consideration a report of the Rules Committee on the same day it is presented to the House requires "a vote of not less than two-thirds of the Members voting . . . ."
 
 
 69
 The Constitution in several instances also requires more than a majority vote of a quorum. For the Senate to convict on impeachment requires "the Concurrence of two thirds of the Members present." U.S. Const. art. I, § 3. To expel a member from Congress requires "the Concurrence of two thirds. . . ." Id., § 5. A roll call in either House shall be entered on the journal "at the Desire of one fifth of those Present. . . ." Id., § 5. Passing a "bill" over a President's veto requires for both the House and the Senate "two thirds of that House. . . ." Id., § 7. Similarly, "Every Order, Resolution, or Vote to which the Concurrence of the Senate and House of Representatives may be necessary" if the President disapproves of same shall be repassed "by two thirds of the Senate and House of Representatives . . . ." Id., § 7. The President may make treaties "provided two thirds of the Senators present concur . . . ." U.S. Const. art. II, § 2. Amendments to the Constitution may be proposed "whenever two thirds of both Houses shall deem it necessary . . . ." Id., art. V. A constitutional convention to propose amendments may be called upon "Application of the Legislatures of two thirds of the several States . . . ." Id., art. V. Constitutional amendments shall be valid "when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof . . . ." Id., art. V. The Twelfth Amendment for the election of President requires "a majority of the whole number of Electors appointed . . . .", and in electing a President in the House of Representatives a quorum consists "of a member or members from two-thirds of the states, and a majority of all of the states shall be necessary to a choice." The same amendment provides that the Vice President shall be the person "having the greatest number of votes . . . if such number be a majority of the whole number of Electors appointed . . . .", and, if no person has a majority, the Senate chooses the Vice President at a meeting at which "a quorum for the purpose shall consist of two-thirds of the whole number of Senators, and a majority of the whole number shall be necessary to a choice." The fourteenth amendment, § 3, provides that the disability thereby imposed for having "engaged in insurrection or rebellion against the" United States could be removed by Congress "by a vote of two-thirds of each House . . . ."
 
 
 70
 So it is customary and usual in many instances for Congress to be required to act by some required vote which exceeds a majority of a quorum.
 
 
 71
 We must thus decide whether Congress in adopting Rule XI, cl. 2. (m)(2)(a), supra, requiring "a majority of the members of the committee" intended to require a majority of the membership of the committee or a majority of a quorum of the committee. As indicated above this can mean a maximum difference between requiring 22 members or 12 members to authorize subpoenas. This is a difference between a majority and a minority of the committee.
 
 The Speaker's letter, supra, asserts that
 
 72
 There is no indication in the legislative history of the rule . . . of any intent to require a different procedure for voting on subpoenas than on other votes taken in House committees.
 
 
 73
 This statement is in error. When the House of Representatives in the 2d Session of the 93d Congress adopted H.Res. 988 it sought to reform the subpoena-issuing practices of its committees. The resolution changed the prior rule, which had allowed a "majority of a quorum," into a requirement of "a majority of the members" to issue subpoenas. See, e. g., Rules of the House of Representatives, 93d Cong. XI, cl. 2. (b) and id., 94th Cong. XI, cl. 2. (m) (2)(a), supra. The resolution making this change in the long-standing rule was entitled the "Committee Reform Amendments of 1974." Requiring "a majority of the members of the committee," rather than a "majority of a quorum," to authorize the issuance of subpoenas was a part of that reform. Accompanying the Resolution to the floor of the House was the Report of the sponsoring Select Committee on Committees, which, with respect to the "SUBPENA POWER," stated:
 
 
 74
 The select committee proposes certain standardized procedures and safeguards covering subpenas that would apply uniformly to all committees. The Committees on Appropriations, Government Operations, and Standards of Official Conduct would continue to have standing subpena authority, while others would be required to receive House authorization for each activity or series of activities. However, in the case of all committees, a majority of the membership of each committee would be necessary to authorize the issuance of a subpena or group of subpenas. Compliance could be enforced only as authorized or directed by the House.[8] (Emphasis added).
 
 
 75
 This clearly indicates that the intent of the authors of the Rule was to require the votes of a majority of the "membership " and since the membership of the Committee is just one figure 43 the Rule would clearly require 22 votes to issue a subpoena. We find no distinction between "a majority of the membership of each committee," as used in the Report, and "a majority of the members of the committee," as used in the Rule which the Report discussed. The "membership" of the committee is 43 and there are 43 "members of the committee."
 
 
 76
 The interpretation of the words "of the members" to refer to all persons named to the body is the unequivocal rule of common law. This was the holding in the Supreme Court of Judicature of Indiana in Logansport v. Legg, 20 Ind. 315 (1863), in which the court, regarding a city council's vote to authorize certain city improvements, construed a city charter providing that improvements could be ordered by the "council, with the concurrence of two-thirds of the members thereof . . ." The court wrote:
 
 
 77
 The order appears to have been voted for and passed, by two-thirds of the members then present, but the transcript very clearly shows that the city council of Logansport is composed of 10 members, and the charter, as has been seen, affirmatively requires the concurrence, to such order, of two-thirds of the members. As the order in question was concurred in by only 6 members, and that number not being two-thirds of the city council, it must be deemed a nullity.
 
 
 78
 20 Ind. at 317 (emphasis added). Similarly, the Supreme Court of Alabama held, in Anniston v. Davis, 98 Ala. 629, 13 So. 331 (1893), regarding the contested election of one Davis to succeed to the seat of a resigned council member:
 
 
 79
 It will be noticed that the common council is composed of eight members. At the meeting at which Davis was elected only five members were present. To fill the vacancy occasioned by the resignation of Riddle by the terms of the charter "a majority vote of the remaining members " was necessary. The minutes of the council as corrected show that only three members, one less than a majority of the remaining members, voted for Mr. Davis. If this be true, he was never legally elected. The council have no authority to disregard the charter provision. No subsequent approval or ratification could legalize or make valid a disregard of this mandate of the charter. The rule that a majority of a quorum controls has no application under such a provision.
 
 
 80
 13 So. at 332 (emphasis added). A similar interpretation was given to "a majority of the members of the board" (emphasis added) in Houser v. School District of South Sioux City, 189 Neb. 323, 202 N.W.2d 621, 623-24 (1972) against arguments similar to those advanced here that the language meant a majority of a quorum. In reaching its decision on a Nebraska statute the court stated:
 
 
 81
 We see no distinction between the phrasing "a majority of all members," and "a majority of members." . . . The language used indicates to us the intention to require a majority of all members of the board, and not a majority of the quorum.
 
 
 82
 202 N.W.2d at 624. I find no cases to the contrary.
 
 
 83
 In looking at the House Rule, and its history, it is also supportive of the above interpretation to note that if the House had intended the normal rules in the House to apply there would not have been any necessity to adopt the provision that it did adopt. It could have just said nothing about the vote required to issue "subpenas" and the general majority of a quorum rule would have stated the required vote. Thus, what the Subcommittee are arguing for is an interpretation that would make matters as though the reform change was never adopted. But, as the Committee Report and the Rule both indicate, the obvious intent was to reform the subpoena issuing practices, inter alia, by requiring a majority vote of the members (membership).
 
 
 84
 To permit a minority of the members of a committee to control its actions in matters as important as issuing subpoenas is contrary to democratic principles and breeds congressional absenteeism. It allows a small number of committee members to exercise vital governmental powers over the rights of citizens that a majority should exercise. When Congress was reforming committee practices by providing safeguards against abuses in the issuance of subpoenas by committees, they were well advised to require a vote by a majority of the members of a committee for the issuance of subpoenas. Subpoenas are very powerful weapons and capable of much abuse. The instant subpoenas are a good example of the tremendous power that may be exercised by Congress through these investigatory instruments. They seek to compel the surrender to Congress of trade secrets worth millions of dollars, the value of which can be utterly destroyed by mere disclosure to the public. If the House does not wish to require a vote of a majority of the members of a committee before issuing such an intrusive document, the House can easily change the rule. There is nothing to the argument that an anomalous situation would be created by such interpretation of the rule because a majority of a quorum of the full House (435 members at maximum) can pass a contempt resolution. That is the rule in the full House, and Rule XI states the rule in committee. This likewise is no technical point, because given the dire consequences of disclosure of the subject data, the committee might be unable to get the additional vote to authorize the subpoena or the committee might impose some needed safeguards against disclosure of the data.
 
 
 85
 Since the necessary vote was not obtained for the issuance of the subpoenas in question it follows that the subpoena was invalid.[9]
 
 IV. RATIFICATION
 
 86
 It is further contended by the Subcommittee that the House ratified the subpoena when it voted to authorize Subcommittee Chairman Moss to appear as an intervenor in this action, in which the validity of the subpoena is in question. I cannot agree. The argument fails to comprehend the scope of the subpoena rule. The intent of that rule is to provide for the orderly consideration by the committee as to whether subpoenas should issue and to assure that a majority of the members of the committee are sufficiently convinced of the necessity and importance of issuing the subpoena to attend[10] the committee meeting and vote in favor of that action before the subpoena issues. Shelton v. United States, 117 U.S.App.D.C. 155, 327 F.2d 601 (1963). The committees of Congress must strictly conform to their rules in obtaining testimony before its committees. Yellin v. United States, 374 U.S. 109, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); Christoffel v. United States, 338 U.S. 84, 69 S.Ct. 1447, 93 L.Ed. 1826 (1949); United States v. Reinecke, 173 U.S.App.D.C. 274, 524 F.2d 435 (1975). Further, it does not appear from the language of the Resolution that there was any intent to ratify the subpoena, even if that could be done. Such intent must be evident, and it must also be evident that the ratifying party has knowledge of the material facts, in this case, the material fact of a violation of the House Rules. Western Nat. Bank v. Armstrong, 152 U.S. 346, 352, 14 S.Ct. 572, 38 L.Ed. 470 (1894); Bloomfield v. Charter Oak Nat. Bank, 121 U.S. 121, 135-36, 7 S.Ct. 865, 30 L.Ed. 923 (1887).
 
 CONCLUSION
 
 87
 Since the subpoena is invalid, it is my view that an injunction should issue prohibiting the enforcement thereof. However, this does not foreclose the Commission from conveying the material to the Subcommittee pursuant to a subpoena that is properly authorized.
 
 
 88
 For the foregoing reasons I respectfully dissent.
 
 
 
 [1]
 The text of 15 U.S.C. § 46(f) (1970) is as follows:
 The Commission shall also have power . . .
 (f) To make public from time to time such portions of the information obtained by it hereunder, except trade secrets and names of customers, as it shall deem expedient in the public interest; and to make annual and special reports to the Congress and to submit therewith recommendations for additional legislation; and to provide for the publication of its reports and decisions in such form and manner as may be best adapted for public information and use.
 
 
 [2]
 At argument, Ashland's counsel conceded that "the only question here is whether this (data) would be kept confidential by Mr. Moss's committee (sic)," May 10, 1976, Tr., 7, and that if it would, the subcommittee was "entitled" to the information. Id
 
 
 [3]
 The text of the exchange in question was as follows:
 GOVERNMENT COUNSEL: Chief Judge Bazelon, may it please the court, the central issue in this case is whether Section 46(f) of the Federal Trade Commission Act gives the Commission any legal basis or any discretion to refuse to comply with a valid Congressional subpoena for trade secret information in the Commission's possession. Our position is two-fold: we submit there is no imminent threat of irreparable injury warranting an injunction and that on the merits neither Section 46(f) nor the Constitution prohibits the Commission from complying with a valid Congressional subpoena for trade secret information. I want to address the merits . . . .
 JUDGE ROBB: Well, would it make any difference whether there was a subpoena or not, so long as the Subcommittee formally requested this material?
 GOVERNMENT COUNSEL: We ask the court to confine its decision to the facts of this case, where there is a valid subpoena. Now, we ask the court to leave for another day any possible question concerning the Commission's legal obligation with respect to Congressional requests, as opposed to subpoenas for information. . . .
 JUDGE ROBB: I know you ask us to do that, but we've got a right to think about it, and I'm asking you for your opinion.
 GOVERNMENT COUNSEL: We think that it's unnecessary to reach the issue.
 JUDGE ROBB: All right. All right, you don't want to answer the question.
 GOVERNMENT COUNSEL: The answer to your question is that the view of the Federal Trade Commission, that they have expressed, is that they feel obligated to comply with Congressional requests. The other independent. . . .
 JUDGE ROBB: I take it you allow me to have my opinion on it.
 GOVERNMENT COUNSEL: Yes, Your Honor. I hope to convince you that the subpoena here is clearly valid and that it's unnecessary to reach that issue.
 JUDGE ROBB: For your information, I can't see that it makes any difference. Go ahead.
 GOVERNMENT COUNSEL: Well, in the view of the . . . .
 JUDGE ROBB: No matter what the FTC thinks.
 GOVERNMENT COUNSEL: In the view of the other independent regulatory agencies and the Justice Department, it might make a difference. We take no position on the matter; we want to reserve our position on that point.
 May 10, 1976 Tr., 28-30 (Conformed to tape recording).
 
 
 [4]
 Government counsel stated that "the view of the Federal Trade Commission that they have expressed, is that they feel obligated to comply with Congressional requests." Tr., 29. On the other hand, counsel emphasized that the Department of Justice "take(s) no position on the matter; we want to reserve our position on that point." Tr., 30
 
 
 [5]
 Of course, there is no requirement that all agencies of the government adopt the same position with regard to matters under litigation. See, e. g., McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944); United States v. ICC, 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970); Seatrain Lines v. FMC, 148 U.S.App.D.C. 424, 460 F.2d 932 (1972), aff'd, 411 U.S. 726, 93 S.Ct. 550, 34 L.Ed.2d 510 (1973); United States v. CAB, 167 U.S.App.D.C. 313, 511 F.2d 1315 (1975)
 
 
 [6]
 The dissent gives only one reason for dispensing with the principles of Chenery :
 In the case before us, . . . there is no issue of FTC expertise. On the contrary, the expertise involved is precisely the expertise of the Department of Justice: the orderly and consistent management of the litigation of the widely diverse agencies and departments of the United States Government. Dissent, 7.
 It is true that where no special agency expertise is involved a court may affirm on a ground in addition to those relied on by the agency. See, e. g., Local 833, UAW v. NLRB, 112 U.S.App.D.C. 107, 300 F.2d 699, 705, cert. denied, 370 U.S. 911, 82 S.Ct. 1258, 8 L.Ed.2d 405 (1962). But a court's view that the agency is lacking in expertise has never been thought to license it to reverse while ignoring the grounds on which the agency relied.
 Moreover, the dissent is simply in error when it asserts that the FTC's expertise does not bear on this case. The FTC's position that it is obligated to honor Congressional requests for information is based on its interpretation of 15 U.S.C. § 46(f), part of the Federal Trade Commission Act. The Supreme Court has directly held that administrative interpretations of such a statute, to which the courts are to accord "great weight," depend on the expertise of the agency, not appellate counsel. Investment Co. Institute v. Camp, 401 U.S. 617, 626-7, 91 S.Ct. 1091, 28 L.Ed.2d 367 (1971):
 Congress has delegated to the administrative official and not to appellate counsel the responsibility for elaborating and enforcing statutory commands. It is the administrative official and not appellate counsel who possesses the expertise that can enlighten and rationalize the search for the meaning and intent of Congress. Id., 628, 91 S.Ct. at 1097.
 While we would be required to give "great weight" to the FTC's interpretation of 15 U.S.C. § 46(f), it is not necessarily controlling. However, we are not called upon in this case to determine whether the FTC's construction of the statute as obligating it to comply with all Congressional requests for information is correct. The Department of Justice is not authorized to press this issue. Cf. S. & E. Contractors, Inc. v. United States, 406 U.S. 1, 92 S.Ct. 1411, 31 L.Ed.2d 658 (1972) (authority to "conduct litigation" under 28 U.S.C. § 516 does not grant Department of Justice general power to challenge in court decisions of other government agencies). No other party has challenged the FTC's action on this basis. See supra note 2. Therefore, we express no opinion on the FTC's obligations in response to Congressional requests.
 
 
 [7]
 Orloff v. Willoughby, 345 U.S. 83, 73 S.Ct. 534, 97 L.Ed. 842 (1953); Gibson v. United States, 329 U.S. 388, 67 S.Ct. 301, 91 L.Ed. 331 (1947); Young v. United States, 315 U.S. 257, 62 S.Ct. 510, 86 L.Ed. 832 (1942). See also McLean Trucking Co. v. United States, 321 U.S. 67, 64 S.Ct. 370, 88 L.Ed. 544 (1944) (ICC affirmed despite confession of error by the United States)
 
 
 [1]
 Edwin E. Huddleson, III, Civil Division, Appellate Section, Department of Justice
 
 
 [2]
 121 Cong.Rec. H 224 (daily ed. Jan. 20, 1975). 29 Members of Congress elected members of the Committee; 121 Cong.Rec. H 322 (daily ed. Jan. 28, 1975) 14 (Republican) Members of Congress elected members of the Committee; Cong. Directory, 94th Cong. 1st Sess., p. 294 (1975) indicates 42 members. Thereafter Congressman Jarman was taken off the Committee. However, he was replaced by Congressman Maguire on March 18, 1975. 121 Cong.Rec. H 1874. The 1976 Congressional Directory, p. 295, discloses that the Committee continued to be constituted with the same 43 members as in 1975
 
 
 [3]
 The resolution, as amended, was adopted 21-15, as shown by the following roll call vote ("P" indicates Proxy vote):
 Thursday, April 17, 1975 (continued)
 AYES NAYS ABSENT
---------------- --------------- -------------
Mr. Moss Mr. Murphy Mr. Macdonald
Mr. Dingell Mr. Satterfield Mr. Adams
Mr. Rogers Mr. Byron Mr. Carney
Mr. Van Deerlin Mr. Devine Mr. Waxman
Mr. Rooney Mr. Broyhill Mr. Hefner
Mr. Stuckey Mr. Carter Mr. Lent
Mr. Eckhardt Mr. Brown Mr. Madigan
Mr. Preyer Mr. Skubitz 7
Mr. Symington Mr. Hastings
Mr. Metcalfe Mr. Collins
Mr. Scheuer Mr. Frey (P)
Mr. Ottinger Mr. McCollister
Mr. Krueger (P) Mr. Heinz
Mr. Wirth (P) Mr. Moorhead
Mr. Sharp Mr. Rinaldo
Mr. Brodhead (P) 15
Mr. Florio
Mr. Moffett
Mr. Santini
Mr. Maguire (P)
Mr. Staggers
 21
 Mr. Dingell moved to reconsider the vote taken on the adoption of the resolution. Mr. Moss moved to table the Dingell motion to reconsider. CARRIED (VV). (J.A.409).
 
 
 [4]
 Rules of the House of Representatives, 94th Cong., XI, cl. 2. (1)(2)(A) (hereinafter cited as House Rules)
 
 
 [5]
 House Rules XI, cl. 1. (a)(1)
 
 
 [6]
 Mason's Legislative Manual, Sec. 510, Para. 1 (1970), and cases cited therein
 
 
 [7]
 Citing:
 Pimental v. San Francisco (1863), 21 Cal. 351; McCracken v. San Francisco (1860), 16 Cal. 591; People v. Wright (1902), 30 Colo. 439, 71 P. 365; State v. Fagan (1875), 42 Conn. 32; Anniston v. Davis (1893), 98 Ala. 629, 13 So. 331; Evanston v. O'Leary (1897), 70 Ill.App. 124; McLean v. East St. Louis (1906), 222 Ill. 510, 78 N.E. 815; Logansport v. Legg (1863), 20 Ind. 315; Cascaden v. Waterloo (1898), 106 Iowa 673, 77 N.W. 333; Hansen v. Anthon (1919), 187 Iowa 51, 173 N.W. 939; Warnock v. Lafayette, 4 La.Ann. 419; Zieler v. Central Power Co. (1896), 84 Md. 304, 35 A. 932; Stockdale v. Wayland School Dist. (1881), 47 Mich. 226, 10 N.W. 349; Whitney v. Hudson (1888), 69 Mich. 189, 37 N.W. 184; State v. Reichmann (1911), 239 Mo. 81, 142 S.W. 304; Edgerly v. Emerson (1851), 23 N.H. 555, 55 Am.Dec. 207; Baker v. Police Com., Port Huron (1886), 62 Mich. 327, 28 N.W. 913; State v. Wilkesville Tp. (1870), 20 Ohio St. 288; Leavitt v. Oxford etc. Silver Mfg. Co. (1883), 3 Utah 265, 1 P. 356; State v. Bevins (1898), 70 Vt. 574, 41 A. 655; Grindley v. Barker (1798) (Eng.), 1 B. and P. 229, 126 Reprint 875; Blacket v. Blizard (1829), 9 B. and C. 851, 109 Reprint 317.
 Mason's Legislative Manual 350-51 (1970).
 
 
 [8]
 H.R.Rep. No. 93-916, Part II, 93d Congress, 2d Sess. 6 (1974)
 
 
 [9]
 It was the Commission's position at oral argument in this court that the case should be decided exclusively on the basis of the subpoena. This can only be interpreted to mean that the Commission's presently intended compliance is based solely on the subpoena, and not on the letter request. Therefore, I do not deal with the letter request of October 29, 1975
 Since a properly authorized subpoena is required for the production of the requested trade secrets, it should also be noted that the Rule provides:
 A subpena may be issued by a committee or subcommittee under subparagraph (1) (B) in the conduct of any investigation or activity or series of investigations or activities, only when authorized by a majority of the members of the committee . . .
 House Rules XI, cl. 2. (m)(2)(A). Thus, subpoenas may be issued by a subcommittee "only when authorized by a majority of the members of the committee . . ." in "the conduct of any investigation or activity or series of investigations or activities . . . ." It seems clear that such language requires the committee authorization for subcommittee subpoenas to relate to some specific investigation or series of related investigations and does not authorize conferring upon a subcommittee blanket authority to issue subpoenas in any investigations it may decide to conduct. The authorizing resolution should designate the particular investigation.
 
 
 [10]
 The validity of the four proxy votes which were recorded as cast for the Resolution is not considered in this opinion. Cf. VIII Cannon's Precedents of the House of Representatives § 2219, id. VII, § 1014